**UNITED STATES of America, Appellee,**

**v.**

**Gino FANTUZZI, a/k/a Luis Jorge Vasquez Urbina, et al., Appellants.**

**Nos. 124, 125, 126, 250 and 270, Dockets 71–1476, 71–1489, 71–1490, 71–1888 and 71–1613.**

United States Court of Appeals, Second Circuit.

Argued Oct. 5, 1971.

Decided July 10, 1972.

Desmond J. O'Sullivan, David G. Trager, Asst. U. S. Attys., Robert A. Morse, U. S. Atty., for appellee.

Edward S. Panzer, New York City, for Fantuzzi; Howard J. Diller, New York City, for Jaramillo; Richard I. Rosenkranz, New York City, for Lopez; Gino P. Negretti, Miami, Fla., for Lie-

ros; Edmund Allen Rosner, Nancy Rosner, Rosner & Rosner, New York City, for Christian.

Before MURRAH*, WATERMAN and SMITH, Circuit Judges.

WATERMAN, Circuit Judge:

Appellants were convicted of having violated 21 U.S.C. §§ 173 and 174 (1964) [1] in that they did unlawfully, wilfully and knowingly conspire to bring cocaine into the United States and to receive, conceal, buy, and facilitate the transportation, concealment and sale of the cocaine so brought into the country knowing that the cocaine had been unlawfully imported. The judgments of conviction were entered on January 25, 1971, at the conclusion of a joint trial before Judge Orrin G. Judd, sitting without jury, in the United States District Court for the Eastern District of New York. On appeal the several defendants raise a host of claims of reversible error which include, *inter alia,* the propriety of a joint trial, the validity of a wiretap order, and the sufficiency of the evidence. All of the contentions, save that of James Christian that there was insufficient evidence to connect him with the conspiracy, are without merit. The issues before us are more fully discussed following an exposition of the facts proved by the Government.

The activities of the defendants below were first brought to the attention of the federal authorities on May 1, 1970 by one Carmen Estrada. At that time Carmen had been visiting her common law husband who was apparently then in federal custody and who was cooperating with the Government on other matters.

The two had been meeting each other in the office of Federal Narcotics Agent Thomas J. Dugan. At some point in the spring of 1970 Carmen had given her spouse information concerning the narcotics-related activities of certain people with whom she had become closely associated and, after discussing with him whether she should inform the Government, she decided to tell what she knew to Agent Dugan. She had known Carmen Lopez (Kitty) and had frequented her apartment in Manhattan since November 1969.[2] In the following few months she met the other members of the alleged conspiracy: Gino Fantuzzi (Fantuzzi), Sergio Jaramillo (Lucho) and Claudine Lieros (Claudine). Fantuzzi, Lucho, Kitty and Carmen Estrada saw one another daily after the initial meeting while Claudine would appear at Kitty's apartment two or three times a week. On those occasions Claudine usually brought with her a "bag of money." Evidently the incident which prompted Carmen to report to Agent Dugan occurred during the week before May 1 when Kitty, having spent the night at the San Carlos Hotel, came back to her apartment "nervous and upset." Carmen was in the apartment and Kitty told her that she had seen a big bag of cocaine and money in Lucho's room at the San Carlos.

It was not, however, until after Carmen's initial visit to Agent Dugan that the dimensions of the conspiracy became apparent. Throughout the months of May and June Carmen related events to the narcotics agent concerning several transactions which involved large amounts of cocaine and substantial sums of money. Those events, as told by Carmen, together with the testimony of

---

* Senior Circuit Judge for the Tenth Circuit, sitting by designation.

1. Sections 173 and 174 were repealed effective May 1, 1971 by § 1101(a) (2) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1236 and were superseded by §§ 401 and 404 of that Act. The Act provides that prosecutions for any violation of the law occurring prior to the effective date of repeal will not be affected by reason thereof. Pub.L. 91–513, 84 Stat. 1236 § 1103.

2. Mrs. Estrada testified that she was at Kitty's apartment which was apparently occupied by Kitty under the name "Catherine Belix" "almost every day. And I used to sleep there. Sometimes I used to stay there with my kids one week, two weeks."

Jose Landaetta, that of a number of federal narcotics agents, and the extensive evidence obtained by wiretapping Kitty's telephone from late May until early June of 1970,[3] defined for the trial court the scope of the conspiracy's activities in New York and in Texas.

The scope of that conspiracy may be depicted by a brief summary of some of its transactions during the month of May. On May 6, Lucho appeared to Carmen to be "a little upset," and Kitty explained to her that he had just received a telephone call from Dallas informing him that "one of his boys with five kilos of cocaine" had been picked up by the police. Apparently because of this arrest Lucho found it necessary to supplement his supply of cocaine, for on the next day, May 7, Carmen saw an elderly lady in Kitty's apartment, and Kitty told her that the woman had just sold Lucho three kilos of cocaine. On the next day, May 8, Fantuzzi, accompanied by Kitty, Lucho and Carmen, drove to a bar in Manhattan. Fantuzzi took a suitcase out of the trunk of the car, entered the bar with it, and returned shortly thereafter with the suitcase. He gave the suitcase to Lucho, who put it in Kitty's lap. Kitty opened it and it was full of money. Fantuzzi explained that the money resulted from a big deal they had just made for the sale of five kilos of cocaine.

After this delivery the group celebrated by joining Claudine and two of her friends at a Manhattan nightclub. Amid the sniffing of cocaine at one point in the evening, Fantuzzi referred to one of the men with Claudine as "the junky that brought in the ten kilos."

On May 10, the second government informant enters the picture. The familiarity of Jose Landaetta (Pepe) with the conspiracy originally seems to stem from his acquaintanceship with Carmen Estrada. He had asked Carmen to see if Lucho would sell him a kilo of cocaine for resale to another; Lucho agreed to do so on May 10, and the delivery of the cocaine was made on the next day by Lucho and Kitty in Kitty's apartment. The cocaine was weighed in Carmen's presence and she witnessed the payment to Lucho by Jose of $10,000, its purchase price. In yet another transaction at about this time, Lucho gave Claudine, Kitty and Carmen some cocaine to sniff and then weighed out 2½ kilos and gave it to Claudine, saying, "Remember, that it's two and a half kilos, and I want the money tonight." When Claudine left Kitty's apartment that day "there was a bag of money that Lucho got."

It is at this point in time, approximately one week before the Dallas transaction, that James Christian (Bruno) first appears. On the evenings of May 14th and 15th, he was at Kitty's apartment accompanied by Claudine.[4] At these times Lucho and Claudine showed a certain degree of familiarity with him by calling him by his nicknames, La-Fiera or La Bestia. In the apartment on those two evenings, as was apparently the case on most evenings, there was the drinking of liquor and the sniffing of cocaine. Upon seeing Jose Landaetta, a stranger to him at that time, Bruno asked on the first of the two evenings, "Who is that guy?" Bruno was then assured that Jose was Lucho's friend and was all right. During his visit on the following night, Jose testified that Bruno and Lucho went into the kitchen and Jose overheard Lucho say, "You have to wait because the stuff of cocaine is coming soon." Moreover, although Jose was not able to hear the amount of money being mentioned, there was also some talk about some money. About a

3. On May 23 the Government, pursuant to 18 U.S.C. § 2518, applied for the wiretap order to intercept communications over the telephone subscribed to by Catherine Belix and installed at her, i. e., "Kitty's" apartment. Judge Wyatt issued his order that day, the wiretapping to terminate, at the latest, 15 days thereafter. At trial it was testified that the tapes had been sealed on June 20.

4. Pepe testified that Bruno appeared at the apartment two or three times. There was, however, specific testimony dealing with the May 14 and 15 visits only.

week thereafter, according to Jose, Lucho said to Jose at Kitty's apartment that he had a big deal with Bruno and Claudine, neither of whom were present, but if there was any cocaine left over he would give it to Jose to sell.

The remainder of the story is the result of piecing together the wiretap evidence and the testimony of Carmen, Jose, and a number of narcotics agents. It seems that Lucho's "big deal" was coming up very soon inasmuch as two days after his statement to Jose he left for Dallas, Texas. Upon his arrival there on May 24, Lucho went to the Ramada Inn and, as instructed by Fantuzzi, made attempts to locate one Pedro Rojas. Lucho had difficulty communicating with the desk clerk in English, and the clerk suggested to Allen L. Caraway, a Spanish-speaking narcotics agent who had Lucho under surveillance, that he assist Lucho. This assistance was accepted by Lucho and, at Lucho's request, Caraway tried unsuccessfully to locate Rojas at several of the motels near the airport, assisted Lucho in checking into the Ramada Inn, and agreed to meet him on the next day.

Lucho and Caraway met the next day at 3 P.M. when Lucho introduced Caraway to Rojas. The agent then assisted Lucho and Rojas by placing long distance calls to Buenos Aires, Argentina, and to a Mr. Hym in Panama City, Panama. Caraway overheard Rojas say to Hym, "Why isn't the stuff here?" And after hanging up Caraway heard Rojas inform Lucho, "At nine o'clock tonight." Agent Caraway's final act of assistance was to place a call to Kitty's apartment in New York for Lucho, and from a wiretap it is learned that Lucho's purpose in calling New York was to tell Kitty to get $3,000 or $4,000 from Claudine and to bring it to him in Dallas.

Back in New York the waiting was evidently becoming difficult for Fantuzzi and Claudine for they both called the apartment, leaving messages that they had to talk to Kitty "urgently." Fantuzzi's urgent message was "with respect to a thing of Lucho's." When Kit-

ty received the abovementioned call from Lucho in Dallas, she made immediate arrangements to go to Dallas, and, giving Carmen a collection list of people who owed Lucho money, placed Carmen in charge of the apartment. Kitty's instructions to Carmen were to tell the people on the list, should they call, to bring the money to the apartment. Upon Kitty's arrival in Dallas she telephoned Carmen and instructed her to contact Claudine and tell Claudine that "our money" is to be handed to Fantuzzi.

On May 27 Rojas and Lucho met one Manuel Villaseca at the Dallas-Love airport upon Villaseca's arrival from Panama City, Panama, and then went directly to the Ramada Inn where Kitty was staying. All four were arrested when they left the Inn at 1:30 P.M. There was, however, no cocaine found upon them. On May 28, Carmen spent the day raising bail money and there were inculpatory telephone conversations between her, at Kitty's apartment, and Fantuzzi and Claudine. On May 29 Carmen flew to Dallas and Kitty and Lucho were released on bail. At the airport pending departure for New York Lucho told Carmen, "the federals are stupid, they only had waited a half hour they'd gotten 27 kilos." After the three of them had happily reached Kitty's Manhattan apartment Lucho told the same story to Jose except that the story grew, as stories do, and now the "Federal police in Dallas was so silly. They wait ten more minutes they will catch them with 30 kilos of cocaine."

To round out the story, Jose brought the bail money for Rojas and Villaseca to Dallas on June 1, where he was met at the airport by Fantuzzi. While they were in Dallas, Fantuzzi commented to Jose that he (Fantuzzi) was lucky that he had not been in Dallas with Lucho for he would have been involved like the rest of the guys. When Jose returned to New York a new plan was devised whereby Jose was to take between $50,000 and $75,000 to Buenos Aires in body bags and with that money buy co-

caine there. However, before this plan could be activated the conspirators were taken into custody in New York. At trial none of the defendants testified.

■ All of the contentions of the appellants other than those of appellant Christian (Bruno) may be dealt with briefly. Fantuzzi and Lucho contend that the lower court erred when it refused to sever their trials from that of the other defendants. Nevertheless, they have pointed to no substantial prejudice resulting to them from that refusal. In this circuit we have adhered to the principle recently enunciated in United States v. Borelli, 435 F.2d 500, 502 (2 Cir. 1970), cert. denied, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971), that an appellant "must demonstrate substantial prejudice from a joint trial, not just a better chance of acquittal at a separate one, and that a trial court's refusal to grant severance will rarely be disturbed on review. United States v. DeSapio, 435 F.2d 272, 280 (2d Cir. 1970)." (Further citations omitted). Moreover, we note that this case falls squarely into the general rule laid down in *Borelli*, 435 F.2d *supra* at 502, "that persons jointly indicted should be tried together 'where the indictment charges . . . a crime which may

be proved against all the defendants by the same evidence and which results from the same or a similar series of acts.' United States v. Kahaner, 203 F.Supp. 78, 80–81 (S.D.N.Y.1962), aff'd, 317 F.2d 459 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963)." A search of the record has revealed no circumstances which would have warranted a grant of the special treatment these appellants sought, or would have required that each of them be given separate trials.

■ The same two appellants, Fantuzzi and Lucho, assert that there was no probable cause for the issuance of the wiretap order by Judge Wyatt on May 23, 1970, because the affidavit upon which the order was based relied upon information furnished by an unnamed informant whose reliability, according to the appellants, was not sufficiently established. The assertion is frivolous. The affidavit of Agent Dugan supporting the request for the issuance of the judicial order stated that his source of information was a confidential informant who had "furnished information on approximately fifty occasions over the past year which has been investigated by your deponent and found to be correct." [5] The question of whether

---

5. Agent Dugan's lengthy affidavit, sworn to before Judge Wyatt on May 23, contained the following special statement as to "Probable Cause," although elsewhere in the entire affidavit there are other additional statements as to Agent Dugan's own knowledge and that of other agents relative to the activities of the persons named and their use of telephone 212–CO5–6717.

PROBABLE CAUSE

7. During the months of April and May 1970, the latest date being May 21, 1970, your deponent has been told by a confidential informant who has furnished information on approximately fifty occasions over the past year which has been investigated by your deponent and found to be correct that:

(a) Gino Fantuzzi, also known as Luis Jorge Vasquez Urbina, Sergio Luis Jaramillo, also known as "Lucho", and Carmen Lopez, aka Catherine Belix, are presently engaged in importing cocaine hydrochloride from Chile, South Ameri-

ca into the United States, and that they meet at 310 West 47th Street, Apartment 5C, New York, New York where they discuss the importation and distribution of the cocaine hydrochloride. The informant received the above information by being present while the aforementioned conspirators discussed the scheme to import and distribute the cocaine hydrochloride and discussed their meeting place.

(b) the aforementioned informant has been present during the beginning of May 1970 when the conspirator Sergio Luis Jaramillo a/k/a "Lucho" discussed the importation of cocaine hydrochloride with unidentified persons on the Telephone at 310 West 47th Street, Apartment 5C, bearing the telephone number 212–CO5–6717.

(c) Sergio Luis Jaramillo offered the aforementioned informant 2¼ kilos of cocaine hydrochloride at a price of $10,000. per kilo during the first part of May 1970, and the informant saw the

there was probable cause for the issuance of the wiretap order hinges in this case upon whether that statement by Agent Dugan provided sufficient information about the informant so as to enable a neutral and detached magistrate to judge for himself the reliability of the source of the information. In Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), upon which the appellants rely heavily, it was pointed out by the Court that, "Though the affiant swore that his confidant was 'reliable,' he offered the magistrate no reason in support of this conclusion." Clearly in this case, the statement that the informant had given correct information on over fifty occasions in the past year supports the conclusion that the source was reliable. Indeed, this court has held in United States v. Dunnings, 425 F.2d 836, 839 (2 Cir. 1969), cert. denied, 397 U.S. 1002, 90 S. Ct. 1149, 25 L.Ed.2d 412 (1970), that the requirements of probable cause were satisfied with the "allegation that the informant had 'furnished reliable and accurate information on approximately 20 occasions over the past four years'. . . ." Moreover, the Fifth Circuit has held that a simple statement that the informer has been reliable on past occasions was sufficient to provide probable cause for the issuance of an order. United States v. Vigo, 413 F.2d 691 (5 Cir. 1969). By comparison, the affida-

vit of Agent Dugan sets forth more than ample support for the claim that the informant was reliable.

■ Four of the appellants raise questions relating to the sufficiency of the evidence. Fantuzzi and Kitty argue that the independent nonhearsay evidence was insufficient to connect them with the conspiracy. This contention is quickly destroyed by a reading of the record. Fantuzzi's complicity in the conspiracy was evident from his acts done and his statements made in the presence of Carmen Estrada and Jose (Pepe) Landaetta and this complicity does not rest upon inculpatory statements by other conspirators when Fantuzzi was not present. Kitty would have us believe that, on the basis of record testimony because she appeared nervous or upset or frightened upon occasion, she was a reluctant participant in the conspiracy and acted only at the bidding of her boyfriend, Lucho. She maintains that she only associated with one of the conspirators and only acquiesced in the goals of the conspiracy. However, the record is replete with probative evidence that at all stages of the conspiracy Kitty participated in it and sought to make it succeed, and there is no evidence that Kitty was forced by Lucho or anyone else to act against her will. It matters not whether she participated for love of Lucho, or for money, or for fun, just so long as she knowingly and willingly took

aforementioned 2¼ kilos of cocaine hydrochloride at 310 West 47th Street, Apartment 5C, at that time.

(d) the informant told your deponent on May 21, 1970 that the conspirators Sergio Jaramillo, Gino Fantuzzi & Carmen Lopez are presently awaiting a large shipment of cocaine hydrochloride. The informant was told this by the conspirators within the past week.

(e) investigation by Special Agents of the Bureau of Customs determined that on May 5, 1970, Gino Fantuzzi, also know as Louis Jorge Vasquez Urbina was staying at the Lincoln Square Motor Inn, New York City Room 321. A check of his room after he checked out by Special Agents of the Bureau of Customs with the consent of the management of the aforementioned Motor

Inn, revealed a discarded empty cigarette box with the number 265–6717.

(f) the aforementioned informant was present at 310 West 47th Street, Apartmen 5C, New York, New York on several occasions at the end of April and the beginning of May when the conspirators Sergio Luis Jaramillo, also known as "Lucho", and Gino Fantuzzi, also known as Luis Jorge Vasquez Urbina telephoned the San Carlos Hotel in Manhattan on the aforementioned telephone and ordered cocaine hydrochloride to be brought to the apartment. Subsequently, someone brought the cocaine hydrochloride and the informant saw the aforementioned cocaine hydrochloride in a number of ¼ ounce packages in the apartment.

part in the conspiracy. And the evidence conclusively shows that she did.

Claudine Lieros also contends that there was not sufficient "evidence to justify a denial of a motion for a judgment of acquittal" made by her. In addition, she argues that the evidence of the sale of the 2½ kilos was improperly admitted. Both contentions seem to be based partially upon a misreading of the indictment. She states that the indictment is specifically addressed to the Dallas transaction, and that, therefore, the substantial evidence implicating her in other narcotics transactions is irrelevant. The short answer to this is that appellant has simply misunderstood the indictment. The indictment covers a continuing conspiracy from January 1 to June 23, 1970, which, in the words of the Government, "was in full swing in April and May 1970." [6] Thus, the evidence relating to her 1970 narcotics-related activities prior to the Dallas episode, including the evidence of the sale of the 2½ kilos, is relevant to the charge in the indictment. [7]

Finally, we come to Bruno's contentions. He argues first, that the Government failed to establish by independent nonhearsay evidence that he had knowledge of the illegal importation of the cocaine, and second, that the evidence pertaining to his words or his acts was insufficient to prove that he was a member of the conspiracy. As we find reversible error on the latter ground we shall have no occasion to discuss the former contention.

It is hornbook law that before the statements of the other conspirators concerning Bruno may be used as evidence against him it must be proved that Bruno was in fact part of the conspiracy. See, i. e., Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Thus, as it was held in United States v. Geaney, 417 F.2d 1116, 1120 (2 Cir. 1969), cert. denied, sub nom. Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), "the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances." We hold that, as a matter of law, the evidence here, taken, in a light most favorable to the Government, did not establish Bruno's participation in the conspiracy.

As evidence that Bruno was a participant in the conspiracy, the Government relies upon testimony relating to Bruno's two or three visits in the company of Claudine to Kitty's apartment during the week previous to the Dallas transaction and upon intercepted telephoned statements made by Claudine to Carmen Estrada after the Dallas arrests. The Government points out that while Bruno was in the apartment the other members of the conspiracy showed a familiarity with him by referring to him by his nicknames and by continuing to sniff cocaine while he was there. Also, the Government relies upon Jose Landaetta's

---

6. The five overt acts listed in the indictment were alleged to have occurred on May 24, May 25, May 26, and June 6.

7. Appellant Lieros also argues that there "was no physical evidence ever presented to substantiate the witnesses' testimony that in fact the white powder [they, Carmen Estrada and Jose Landaetta] allegedly saw change hands was in fact cocaine." In United States v. Agueci, 310 F.2d 817 (2 Cir. 1962), cert. den. 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963), we pointed out, however, at page 828 that, "Just as with

any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists as long as the evidence furnished ground for inferring that the material in question was narcotics."

Moreover, here the conspirators' behavior toward the material—such as the fact that they sniffed it—provides solid evidence to support the conclusion that the white powder was in fact cocaine.

testimony that on Bruno's first arrival at the apartment when he saw Jose, a stranger, Bruno asked Lucho, "Who is that guy?" and that on his second evening visit, Lucho and Bruno went into the kitchen where Lucho was overheard to say, "You have to wait because the stuff of cocaine is coming soon."

The admission of this testimony of Jose that he overheard this comment by Lucho was objected to when the Government offered it into evidence and it was received by the court subject to connection as to whether the Government could later show enough to satisfy its burden that Bruno, in fact, was a member of the alleged conspiracy.

We find that the Government failed to establish the necessary connection, and, as a result, Jose's testimony was testimony of prejudicial hearsay, was improperly admitted, and should not have been considered probative. We are unable to find solid ground upon which the statement could have been admitted, nor was one given in the court below. Nevertheless, it is clear that the district court placed reliance upon Jose's testimony in its decision to deny the defense motion made at the close of all the evidence to acquit.[8] Insofar as there could be any possible grounds for its admission, its admission would be that of an "adoptive admission," that is, a statement of a third party against the interest of the defendant, to which the defendant has assented, or which he has adopted by word or deed as his own. See Rule 8–01(c) (3)ii of the Proposed Rules of Evidence for the United States District Courts; Uniform Rules of Evidence, Rule 63(8) (b) ; 4 Wigmore, Evidence, § 1071 (3d ed. 1940). There is no evidence here, however, that Bruno either adopted or assented to Lucho's statement. •

There is a crucially fundamental difference between the admissibility of the third party's statement in this case and the adoptive admission discussed in United States v. Geaney, supra 417 F.2d at 1120. In *Geaney,* the third party's statement was made while the defendant was in front of the witness who testified to it, and the witness was able visually to observe the defendant's reaction to it. In this case the witness Jose Landaetta was not able to observe Bruno's reaction to Lucho's statement for, according to his testimony, he was sitting in the living room listening to music or watching television while Bruno and Lucho were talking in the kitchen. Not only was Jose unable to observe Lucho and Bruno but he did not hear any response made by Bruno to the Lucho comment. Under these circumstances, the Government has failed to prove that Bruno adopted the statement either through word, silence, or deed, and, thus, Jose's testimony of overhearing Lucho's statement must be treated as any other nonprobative hearsay declaration.

We are constrained to hold that the Government has proved little more than association between Bruno and the conspirators. As was stated in United States v. Ragland, 375 F.2d 471, 477 (2 Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968), "It is true that an association with an alleged conspirator, without more, is insufficient to establish the necessary foundation for the admissibility of the incriminating statements . . . [citations omitted] . . . The accused must 'in some sort associate himself with the venture, . . . participate in it as in something that he wishes to bring about . . . [or] seek by his action to make it succeed.' United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)."

---

8. The district judge stated the following at his denial of the defendant's motion for acquittal:

"There is one item of direct testimony that he knew of dealings in cocaine because of Lucho's remark to him that . . . 'You have to wait because the stuff of cocaine is coming soon.'

The fact that this conversation may have been in the kitchen goes to Landaetta's credibility, not to the prima facie case."

We recognize the practical difficulties a trial judge must meet in making the necessary threshold determination at the trial level once all the evidence is in. Nonetheless, it is a determination that must be made on the basis of sufficient probative evidence, and we rule here that the Government has not met its burden of proving by a preponderance of independent nonhearsay evidence that James Christian was a participant in the conspiracy, and we direct that he be acquitted.

The conviction of James Christian is reversed. The convictions of Gino Fantuzzi, Sergio Luis Jaramillo, Carmen Lopez and Claudine Lieros are affirmed.