**UNITED STATES of America,
Appellee,**

v.

**Warnell VEGA, a/k/a Skippy, et al.,
Appellants.**

**Nos. 500–502, 504, 517–521,
Dockets 71–1934 to 71–1940, 71–2210,
71–2211.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 23, 1972.

Decided April 12, 1972.

Desmond J. O'Sullivan, Sp. Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., and David G. Trager, Asst. U. S. Atty., on the brief), for appellee.

Gary R. Sunden, New York City, for appellants Warnell Vega, Leroy Allen, Pedro Carew, Bobby Wyler and Sylvester Moore.

Jerald Rosenthal, New York City, for appellants Orlando Guridi, Louis Guridi and John Tirado.

Ivan S. Fisher, New York City, on the brief, for appellants Nelson Rivera and Dalilah R. Reyes.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

The ten appellants in this case seek reversal of their convictions, following trial before a jury and Chief Judge Mishler in the Eastern District of New York, for conspiring to import narcotics into the United States and to buy, sell, conceal and facilitate the transportation, concealment, and sale of narcotics known to them to have been illegally imported, all in violation of 21 U.S.C. § 174. We find no error and affirm.

The facts, developed in some 4,000 pages of trial transcript, may be briefly summarized for the purpose of considering the appellants' claims of error. Oscar Estrada was a principal government witness. In or about January 1968 appellant Pedro Carew introduced him to Toni Flores and Jesus Torrado, owners of the Georgia Girl bar in Manhattan. Shortly thereafter Estrada began working at the bar and in their narcotics business. Appellants Sylvester Moore, Leroy Allen, and Warnell Vega were introduced by Flores and Torrado to Estrada with the instructions to "take care" of Moore and the confidence that Allen and Vega were customers of the narcotics business. Moore and Allen visited the bar almost daily, and Vega telephoned frequently about narcotics. Moore also maintained a car rental agency in Harlem, and Flores occupied an office therein out of which he sold cocaine and heroin when the bar was "hot."

Estrada's wife, Carmen, worked as a barmaid at the bar during February and March of 1968. She testified that the customers were mostly narcotics rather than liquor customers, that Flores told her to take care of the narcotics customers, and that appellants Moore, Allen, Carew, Vega, and Louis and Orlando Guridi were frequent or daily visitors to the bar. She was also told by Flores that Moore was one of the best customers, and she overheard Flores and Torrado arguing with Moore about the quality of narcotics Moore had received. She saw Moore bring money to Flores and Torrado about six times, and she saw them sniff cocaine after counting the money.

In March 1968 Moore gave Flores and Estrada $12,000 with which to purchase some three kilos of cocaine from Raul Fernandez and Fernando Acosta in Miami, Florida, and $1,000 for expenses in connection with the transaction. In April Torrado and Estrada took two suitcases, brought by Torrado from Miami and containing heroin, cocaine and guns, to Torrado's apartment in New Rochelle, where appellant Carew, Torrado's "chemist," mixed, strained, weighed, and packaged some of the heroin. The following day cocaine and heroin were delivered to appellant Vega, who examined the narcotics and, satisfied as to their quality, made a down payment. Further deliveries were made to Vega on a weekly basis. Later in April Torrado and Estrada delivered cocaine to appellant Allen, to whom Estrada subsequently made five or six more deliveries. Also in late April Torrado and Estrada delivered both heroin and cocaine to appellants Nelson Rivera and Dalilah Reyes, operators of a dry cleaners in the Bronx. Estrada returned several times thereafter to try to collect the money for the cocaine, which Rivera and Reyes claimed was so inferior that they had had to make refunds to their customers.

In May Estrada delivered or accompanied delivery of narcotics to appellants Carew, Orlando and Louis Guridi, and Vega. Transactions with Vega and the Guridis continued throughout June. Estrada and Torrado also delivered cocaine

to appellant Bobby Wyler on at least two occasions in June.

Louis Gomez, another government witness, began working for the conspiracy on June 22. He testified to having been present at narcotics transactions with appellants Allen and John Tirado, to having spoken several times with Vega on the telephone about Vega's need for narcotics for his own customers, and to having collected money from Vega for cocaine. Gomez also visited appellants Rivera and Reyes at the dry cleaners to collect for the previous sale of cocaine, whereupon Rivera and Reyes complained that the last purchase had been no good but agreed to pay installments if Torrado agreed to keep on supplying them. Gomez also estimated that the volume of narcotics sold by the conspiracy resulted in a "take" of between $100,000 and $150,000 per week.

Appellants Vega, Carew, Allen, Wyler, Rivera and Reyes argue that reversal is appropriate because the government alleged a single conspiracy but proved instead several conspiracies of the "hub/spoke" variety. We disagree. "[T]he mere fact that certain members of the conspiracy deal recurrently with only one or two others does not exclude a finding that they were bound together in one conspiracy." United States v. Agueci, 310 F.2d 817, 826 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S. Ct. 1013, 10 L.Ed.2d 11 (1963). "An individual associating himself with a 'chain' conspiracy knows that it has a 'scope' and that for its success it requires an organization wider than may be disclosed by his personal participation. Merely because the Government in this case did not show that each defendant knew each and every conspirator and every step taken by them did not place the complaining appellants outside the scope of the single conspiracy. Each defendant might be found to have contributed to the success of the overall conspiracy, notwithstanding that he operated on only one level." Id. at 827.

Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the case most frequently cited by appellants in conspiracy cases, is inapposite. That case involved thirty-two defendants and some eight separate conspiracies to defraud the government in relation to FHA loans. The separate conspiracies were connected by one Simon Brown as the "hub"; each particular group had no interest in the success or failure of each other group. In the instant case, however, the volume of transactions involved necessarily put the purchasers on notice that the operation was sufficiently large-scale to include other purchasers as well as importers, wholesalers, and so forth. Those operating at one level (e. g., the retailers) certainly relied on the successful activities of those operating at another level (e. g., the importers). "It is clear that in a narcotic conspiracy case of this nature no one member of the group can by himself insure the success of the venture; he must know that combined efforts are required." Agueci, supra, at 827.

In any event, the issue in Kotteakos, and the test for reversible error, is not whether more than one conspiracy has been proved, but whether such a variance resulted in substantial prejudice to the appellants. We are directed to no specific prejudice resulting from the single indictment, and find a consolidated trial appropriate. See id.

Appellants Orlando Guridi, Louis Guridi and John Tirado argue that because they were minor participants in a large conspiracy they were prejudiced by not having been tried separately. A joint trial is improper, however, only if substantial prejudice results therefrom, and not if there would simply be a better chance of acquittal at a separate trial, an argument which is purely speculative at best. United States v. Borelli, 435 F.2d 500 (2d Cir. 1970), cert. denied, 401 U.S. 946, 91 S. Ct. 963, 28 L.Ed.2d 229 (1971). The evidence adduced at trial against the Guridis was overwhelming. They frequently handled transactions involving thousands of dollars worth of heroin and cocaine. The evidence against Tirado was as compelling.

 Orlando Guridi argues that his conviction should be reversed because the district court allowed evidence tending to show that he exercised his right to remain silent during a removal hearing in Florida. The flaw in this contention is that Guridi did not, in fact, remain silent in the Florida hearing but instead, while represented by counsel and in open court, denied that he was the Orlando Guridi sought by the authorities. At trial he denied his Florida testimony. Testimony in rebuttal by a government witness present at the Florida hearing was not prejudicial to a right to remain silent which was never exercised.

 Appellant Moore claims that proof of his knowledge of the illegal importation of the narcotics with which he was dealing was insufficient. The government concedes that there was no direct evidence demonstrating Moore's actual knowledge, and that the statutory inference arising from possession was unavailable, but argues that the circumstantial evidence to this effect was overwhelming. We agree. The circumstantial evidence consisted of, *inter alia*: testimony that Moore visited the Georgia Girl bar frequently, that he frequently purchased large quantities of heroin and cocaine from Flores and Torrado, and that he put up $12,000 to purchase some three kilos of cocaine from Fernando Acosta in Miami. From his daily association with the leaders of the conspiracy and his continuous large-scale transactions with them, we think that the jury was entitled to find Moore intimately involved with the conspiracy and fully knowledgeable that the narcotics were illegally imported. United States v. Ah Kee Eng, 241 F.2d 157 (2d Cir. 1957), is distinguishable. There but a single transaction was involved; here the transactions were sizable and continuing.

We have considered the other claims of the appellants and find them wholly without merit. Judgments affirmed.