**UNITED STATES of America, Appellee,**

**v.**

**Charles CASSINO et al., Defendants-Appellants.**

**Nos. 910–914, Docket 72–1160, 72–1192, 72–1235, 72–1236, 72–1244.**

United States Court of Appeals, Second Circuit.

Argued June 27, 1972.

Decided Aug. 11, 1972.

Certiorari Denied Jan. 23, 1973. See 93 S.Ct. 957, 959.

Irving Anolik, New York City, for defendants-appellants Charles Cassino and Michael Roman.

Roy M. Cohn, New York City (Saxe, Bacon & Bolan, New York City, Thomas A. Bolan, New York City, and Michael Rosen, Brooklyn, of counsel), for defendant-appellant Nicholas Rattenni.

William Sonenshine, Brooklyn, N. Y. (Evseroff, Newman & Sonenshine Brooklyn, N. Y.), for defendant-appellant Eugene Curico.

Morton N. Wekstein, Yonkers, N. Y., for defendant-appellant Vincent Malavarco.

Peter F. Rient, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, Edward M. Shaw, Asst. U. S. Atty., of counsel), for appellee.

Before MOORE, SMITH, and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

Charles Cassino, Nicholas Rattenni, Eugene Curico, Vincent Malavarco, and Michael Roman appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after trial by jury before Judge Cooper. The five appellants, with seven others, were indicted on April 14, 1971, for conspiracy to violate and substantive violations of the Travel Act.[1] Stated simply, the indictment charged the defendants with engaging in a concerted scheme to bribe New York State policemen in order to protect illegal gambling operations in New York from official interference. We affirm the appellants' convictions.

## I.

The government's case rested upon the testimony of a senior investigator for the New York State Police, Joseph Colligan, and the agents who conducted surveillance of him and of the defendants. This testimony established the following case for the government.

### A.  *Roman Contacts Colligan*

During the afternoon of September 29, 1969, Colligan, who was assigned to the Stony Point State Police Station in Rockland County, New York, received a telephone call from Albert Parietti.

---

1. *See* 18 U.S.C. §§ 371 (conspiracy), 1952 (interstate travel in aid of racketeering), and 2(a) (aiding and abetting) (1970). Section 1952 prohibits interstate travel with the intent to, *inter alia*, violate state gambling and bribery laws. The state gambling and bribery laws allegedly violated or intended to be violated are N.Y. Penal Law, McKinney's Consol.Laws, c. 40, §§ 225.05 (promoting gambling), 225.10 (promoting gambling), 225.20 (possession of gambling records), 200.00 (bribery), 200.10 (bribe receiving), 200.-20 (rewarding official misconduct), 200.-25 (receiving award for official misconduct), 200.30 (giving unlawful gratuities), 200.35 (receiving unlawful gratuities) (McKinney's 1967).

The indictment was brought in fourteen counts against the appellants and Peter Variano, Ernest Lattanzio, Louis John Boggia, Louis Nicholas Sabbatini, Mannie Cohen, William Alter, and Albert Parietti. Count one charged the 12 defendants with conspiracy to commit offenses against the United States. Counts 2–14 charged the defendants with substantive violations of 18 U.S.C. §§ 2, 1952 (1970).

Variano entered a plea of guilty prior to trial to count one; he was sentenced to three years in prison. The prosecution of Sabbatini was severed prior to trial and subsequently dismissed. The charges against Lattanzio, Boggia, Cohen, and Parietti were dismissed during the trial. On November 24, 1971, the jury found Cassino and Curico guilty on counts 1 and 8 (18 U.S.C. §§ 1952, 2, N.Y.Penal Law § 225.05), Rattenni guilty on counts 1, 6 (18 U.S.C. §§ 1952, 2, N.Y.Penal Law §§ 200.00, 200.10, 200.20, 200.25, 200.30, 200.35), and 13 (18 U.S.C. §§ 1952, 2, N.Y.Penal Law § 225.05), Roman guilty on counts 1, 2 (18 U.S.C. §§ 1952, 2, N.Y.Penal Law §§ 200.00, 200.10, 200.20, 200.25, 200.30, 200.35), and 9 (18 U.S.C. §§ 1952, 2, N.Y.Penal Law § 225.05), Malavarco guilty on count 1 and not guilty on count 8, and Alter not guilty on count one.

Rattenni was sentenced to three years in prison and fined $30,000, Roman to two years in prison, Cassino and Curico to 18 months, and Malavarco to one year.

Parietti asked Colligan to meet with him later in the afternoon. Colligan agreed and the two met later in the day. Parietti asked Colligan if he would meet with Michael Roman to discuss gambling operations in Rockland County. Colligan replied that he would have to consider the matter. The next day Colligan informed his superior of the conversation with Parietti.

Colligan met with Roman on October 1, 1969. This meeting was under surveillance. During the meeting Roman told Colligan that he was "authorized" to pay Colligan $500 just for sitting down and talking. "He then went on," testified Colligan, "to say that his organization had authorized him to come to see me, to make me a proposition to offer me $500 per month to protect his organization's gambling places in Rockland County." [2]

The offer was not attractive to Colligan; he asked Roman to arrange a meeting with "his people" to discuss more lucrative offers. Roman agreed and promised Colligan that if he sat down with Roman and the "Number 1" man, he would be made an offer he could not resist.

Apprehensive about Colligan's loyalties, Roman asked him whether he was "wired" (wearing a recording device). Colligan replied no; Roman responded by stating " . . . well, what could I get out of it, six months, and then only if you could prove it." [3] Roman also was nervous about a gentleman sitting close by whom he believed to be one of Colligan's "people." Displaying considerable presence of mind, Colligan not only admitted this but also introduced the agent to Roman, telling the agent "Mike" was a friend of his. They then had a few drinks together.

### B. *Colligan Meets Number 1*

On October 8, 1969, Colligan met with Roman and Number 1 in the parking lot of Christy's New Town House in Nyack,

New York. Number 1 turned out to be Peter Variano, who was indicted with appellants but entered a plea of guilty prior to trial. Colligan got into Roman's car and the three drove for "a meal and some drinks" to the Las Vegas restaurant in Northvale, New Jersey. After telling Colligan that "[t]his meeting has been a long time in coming," [4] Variano said that he had a "marriage" with several New York State policemen, naming appellants Cassino, Curico, and Malavarco. Cassino was a New York State police lieutenant and member of the New York State Joint Strike Force On Organized Crime, while Curico and Malavarco were senior investigators.

At the Las Vegas, Variano proposed to Colligan that for protection of his gambling operations in Rockland County Variano would pay $1000 per month plus fringe benefits—clothing, free trips to Las Vegas and Puerto Rico, a car, and free tickets to sports events. Colligan accepted the offer, and immediately thereafter Variano asked whether he could bring another bookmaking operation into Rockland County. Colligan responded favorably, at which point Variano told Roman to make a telephone call. While Roman was on the phone, Variano gave Colligan $1000 in hundred dollar bills. The new bookmaking operation was set up via the telephone call; Variano told Colligan that the two of them would split the proceeds from the operation and that they would probably each make $300 a week from it.

### C. *The Wednesday Meetings at the Las Vegas*

From October 8, 1969, until the end of February, 1970, Variano and Colligan met virtually every week, usually on Wednesday evenings and usually at the Las Vegas. These meetings, occasionally attended by appellant Rattenni, generally included discussions of different aspects of Variano's gambling operations and the roles played by the various

2. Transcript of Trial (Transcript) at 231.

3. *Id.* at 232.

4. *Id.* at 238.

members of the state police who were being paid to protect those operations. Variano invariably paid for the food and drinks consumed and periodically gave cash payments of $1000 to Colligan, as well as assorted gifts (*e. g.*, tickets to sporting events, clothes, a vacation to Puerto Rico).

1. *The evidence of Rattenni's involvement.*

At the weekly meeting of October 22, 1969, Variano told Colligan something of his relationship with Rattenni.

> He [Variano] then went on, he said to me [Colligan], "People are always trying to—people are always trying to relate me as a partner of Nicholas Rattenni's . . . .
>
> . . . .
>
> He stated that this wasn't so, that Nick Rattenni was in the refuse business, and at times he fronted money for him, if he was hit hard on a gambling hit, that he would—if he needed $20,000, $25,000 on a Monday morning or any day where he is hit hard on his books, that the man would give him the money.[5]

At the meeting of November 19, 1969, Variano and Colligan were joined by Rattenni. During the evening Variano spoke of bringing a crap game into the county. Rattenni offered the following advice.

> [Colligan]
>
> A. Mr. Rattenni told Mr. Variano that you have to go slow, you can't go too fast in the business, you take it easy and if you ran the crap game right, ran it two nights a week, that would be worth more than his business phones were at the present time.
>
> . . .
>
> . . . . . .

5. *Id.* at 301.

6. *Id.* at 350–52.

7. *Id.* at 352–53.

8. *Id.* at 352.

9. Rattenni expressed his uneasiness about Cassino to Colligan on several other oc-

At this time Mr. Rattenni said to Mr. Variano that "You don't expose him, don't let him get the house, you let your bookkeeper get the house for you and this way you don't expose him at all," meaning myself. Mr. Variano agreed with Mr. Rattenni that this was—

> . . . . . .
>
> A. Mr. Variano stated to Mr. Rattenni that this was right, that he would have his bookkeeper get the house, and then Mr. Rattenni asked Mr. Variano what my part would be in the operation. Mr. Variano told Mr. Rattenni that I would protect the game for him on the nights it was in operation.
>
> Q. What did Mr. Rattenni say, if anything?
>
> A. Mr. Rattenni said that this was a good thing.[6]

Rattenni at this same meeting also aired his opinion of Cassino, Curico, and Malavarco. While he praised Malavarco and Curico (". . . very good boy, did things without making noise. . . very classy person . . . didn't make any noise when he did anything for you."),[7] he distrusted Cassino, believing him "too loud, ma[kes] too much noise, tr[ies] to be a big shot,"[8] and advised Variano to get rid of him.[9]

In Rattenni's presence, Variano then gave Colligan copies of FBI search warrants in support of a raid in Nyack a month earlier, saying that he had asked Cassino to review them "with a fine tooth comb" with a view to contesting them in court, and asked Colligan to do the same.

At the December 1, 1969, meeting with Variano and Colligan, Rattenni mentioned an incident in which the FBI had returned an automobile to a book-

casions. While Rattenni attempts to impugn the accuracy of one of these reported conversations, there is no doubt that Rattenni appears through Colligan's testimony to have been seriously concerned about the risk that Cassino would jeopardize Rattenni's freedom.

maker they had arrested and asked Colligan whether this was unusual. When Colligan replied that it was not unusual if there was too much money owed on the car, Rattenni said that the bookmaker had given a statement to the FBI, that the FBI was going to give him a new identity and move him to Virginia to work for them there, and that Variano "should get rid of this guy." [10]

On January 9, 1970, Rattenni was present when Colligan informed Variano that one Patsy Borgese was no longer the target of a Strike Force gambling investigation and when Variano told Colligan that he would make airline and hotel reservations for Colligan and his wife to go to Puerto Rico.

On February 4, 1970, Rattenni was present when Variano told Colligan, after paying him $1000 (not in Rattenni's presence): "I pay you, I don't know what you do with the money. I never ask you what you do with your money, I don't know whether you pay off one of your people or not, I never ask anyone what they do with it and I never pay anyone in front of anyone." [11]

2. *Further evidence of Cassino's, Curico's and Malavarco's involvement.*

During the meetings between them, Variano discussed in further detail with Colligan the services provided to his operations by Cassino, Curico, and Malavarco. Variano said that Cassino was responsible for his being the number one bookmaker in the area and recounted the circumstances under which Cassino had helped him set up his bookmaking establishments in Rockland County. Variano also told Colligan that Cassino owned a bookmaking establishment himself, and worked at one of Variano's locations. In addition, Variano said that Cassino provided protection to Variano by warning of impending raids, by identifying

and raiding Variano's competitors, by making stand-in arrests [12] for Variano, and by performing such sundry services as paying off other state policemen and scrutinizing FBI search warrants for defects.

As for the services provided by Malavarco and Curico, Variano told Colligan that he had requested Malavarco's permission to use certain phones in Westchester County, that Malavarco had investigated a competitor of Variano's at Variano's request, that he had asked Malavarco to stay in touch with Officer Sabbatini concerning gambling raids while Variano, Colligan, Cassino, and Curico went to Puerto Rico, and that Malavarco paid Sabbatini and Curico out of the money which he was paid by Variano. With respect to Curico, Variano told Colligan only that Curico was paid $100 a week by Malavarco out of the money that Variano paid Malavarco.

During the period that Colligan was meeting with Variano, surveillance was conducted of the appellants. Cassino, Curico, and Malavarco were each seen on several occasions with Variano. For example, Malavarco was seen meeting with Variano in Variano's car near Malavarco's home on three occasions during December, 1969, and February, 1970, and once in December, 1969, in the men's room of a restaurant.

On November 26, 1969, Variano gave Colligan a Westchester County telephone number which he said belonged to Harry Creighton, a policy operator who was competing with him in the Orangeburg area of Rockland County, and asked Colligan to forward the number to Malavarco so that Malavarco could do something about Creighton. Variano also suggested that Colligan ask Malavarco who Variano was and predicted that Malavarco would demonstrate his loyalty to Variano by saying that he was a small time

10. Transcript at 373.

11. *Id.* at 491.

12. Stand-in arrests are arrests of people paid to be arrested to give the illusion that the gambling laws are being enforced.

bookmaker who was no longer in business. Colligan telephoned Malavarco the next day, gave him Creighton's number and asked him to investigate it. Malavarco said he would do so and, in response to Colligan's inquiry as to who Variano was, said "some people say he is a bookmaker, some people say he is a big bookmaker, some people say he is a small bookmaker, some people say he operates strictly in Rockland County, but he [Malavarco] never hears of him in Westchester County,"[13] even though Variano had estimated that 80% of his business was in Westchester County.

### D.  *The Puerto Rican Trip*

In late January, 1970, Colligan, Cassino, and Curico spent several days in Puerto Rico as Variano's guests. Cassino and Curico stayed at the same hotel where Variano was staying, were taken to dinner and a show by Variano on two occasions, and were frequently seen in his company. During the Puerto Rican trip, Curico told Colligan that he had been accepting "meals, drinks and stuff" from Variano for nine months. In Curico's presence, Cassino told Colligan that he paid Sabbatini $100 a month for "information that [Sabbatini] was giving out on gambling to Vincent Malavarco."[14] Also in Curico's presence, Cassino warned Colligan to be careful of Lieutenant Dirschka, his superior, who had "almost caught me [Cassino] by accident at one time."[15]

On February 25, 1970, about a month after the Puerto Rican trip, Variano told Colligan in Rattenni's presence that there were rumors circulating to the effect that Colligan, Cassino, and two others had been in Puerto Rico with a bookmaker. Colligan met with Cassino and Curico the same day to tailor their stories, and it was decided that he and Cassino would admit having been in Puerto Rico but that Curico would deny it.

### E.  *Cassino, Curico, and Malavarco Are Arrested*

Colligan's investigation ended on March 5, 1970, with the arrests of Cassino, Curico, Malavarco and others. After his arrest, Cassino confessed his involvement with Variano's gambling enterprises, admitted having furnished Variano with the name of a Strike Force target and having made stand-in arrests for Variano, and admitted that Variano had paid for his trip to Puerto Rico as well as giving him clothes and tickets to sporting events. Curico, in his post-arrest statement, initially claimed that he had never met Variano but then admitted having met him on numerous occasions over the past five or six years. Curico at first denied having taken a trip to Puerto Rico, but then admitted that he had gone there under an assumed name and had seen Variano and had drinks with him there. Malavarco, when asked about Variano after his arrest, denied having met with Variano on the four occasions when the two men were seen together by surveilling agents, or on any other occasion.

### II.  Asserted Grounds for Reversal

#### A.  *Sufficiency of the Evidence*

■ All appellants contend that the evidence was insufficient to submit the charges against them to the jury and/or that the evidence is insufficient to sustain their convictions.

A multi-defendant trial involving a criminal conspiracy count and related substantive counts almost always presents serious legal problems both for the trial judge and counsel. The case, of necessity, must be unfolded through the testimony of one or more witnesses —and in narrative form. Upon appeal the record must be considered as a whole. More likely than not the facts will be developed chronologically. In admitting testimony, the trial judge is con-

---

13.  Transcript at 372.

14.  *Id.* at 478.

15.  *Id.* at 480.

fronted with two seemingly conflicting principles (1) hearsay declarations of co-conspirators are admissible; (2) hearsay declarations are not admissible until a conspiracy has been established. But in real life, conspiracies are not so easily identified. It would be a rare case in which the conspirators assembled together and planned to bribe State officers. The law has taken cognizance that conspiracies are not so born. It permits inferences of their existence to be drawn from the conduct and speech of the actors. Just as a complicated brief cannot be written in one sentence, neither can events covering a substantial period of time be disclosed in a single answer. For this reason the trial judge is forced to anticipate the future and accept testimony "subject to connection." This necessitous practice leads to the question: has it been connected? In a long trial it is frequently impossible to point to any definite nexus. The trial judge has to decide whether a conspiracy has been established and whether hearsay has been properly admitted upon that supposition. The appellate court is able to view the record as a unit and has the advantage of reading the completed testimony—an advantage which the trial judge did not have in ruling upon each question and answer as the case was unrolled.

Under these standards of review we conclude that the evidence is sufficient to support the appellants' convictions.[16] Of this there can be no question as to Cassino, Curico, or Roman. Rattenni contends that the evidence of his "stake"[17] in the conspiracy is insufficient to warrant a finding of participation. We disagree. Colligan's testimony as to what Rattenni had told him in their various meetings was sufficient to warrant a reasonable conclusion that there "was a working relationship between the two men,"[18] and that Rattenni was associated with the venture to protect Variano's gambling operations from official interference and sought to make it succeed.[19] His thorough knowledge of Variano's operations, his advice as to how to run those operations, and his concern about the loyalties of the officers on Variano's payroll permit the reasonable conclusion that Rattenni was more than a "drinking companion"[20] of Variano. While the evidence independent of the declarations of co-conspirators as to Malavarco's participation in the conspiracy is not overwhelming, it is sufficient. His response to Colligan's telephone inquiry of November 27, 1969, concerning Variano, and particularly his rather unusual meetings with Variano (three times at early morning hours in Variano's car and once in the men's

16. *See* United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

17. ". . . He [the alleged conspirator] must in some sense promote their venture himself, make it his own, have a stake in its outcome." United States v. Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) (L. Hand, J.).

18. United States v. Peltz, 433 F.2d 48, 51 (2d Cir. 1970), cert. denied, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971). *See also id.*: ". . . It is unnecessary to a conspiracy that the relationship contemplated mutual benefit, . . . ."

19. *See* Pereira v. United States, 347 U.S. 1, 9–11, 74 S.Ct. 358, 98 L.Ed. 435

(1954); Nye & Nissen v. United States, 336 U.S. 613, 618–620, 69 S.Ct. 766, 93 L.Ed. 919 (1949), *quoting* Learned Hand in United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938): "In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by *his action to make it succeed.*'"

20. "What the record does show is a clear picture of Rattenni as an outsider, a drinking associate, a gossiper, who was not a participant in, nor one who furthered, the conspiracy." Reply Brief for Appellant Rattenni at 7.

room of a restaurant), unreported and denied upon arrest, permit the reasonable conclusion that Malavarco was a member of the conspiracy.[21]

Similarly the jury could have found on all the evidence that the appellants committed the crimes charged beyond a reasonable doubt. Again as to Cassino, Curico, and Roman there can be no doubt. The independent evidence of Rattenni's association with the conspiracy, and Variano's statement of October 22, 1969, that Rattenni would stake him $20,000 to $25,000 whenever he needed it, permit the conclusion that Rattenni was a member of the conspiracy.

Rattenni contends that there is no direct evidence establishing that on February 4, 1970, he travelled *from New York* to New Jersey (where the Las Vegas Restaurant is located), thereby vitiating his conviction on the substantive counts charging violations of the Travel Act. But the jury could have concluded on the basis of circumstantial evidence that in fact Variano and Rattenni came from New York for the meeting: with the exception of the Las Vegas meetings, every time Colligan saw Rattenni they were in New York; Variano's operations were shown to be in New York and on each of the three occasions when Rattenni joined Colligan and Variano for dinner at the Las Vegas he arrived with Variano; and after the February 11, 1970, meeting all three men drove back to New York.[22]

Finally, Variano's and Rattenni's declarations as to Malavarco's participation

in the conspiracy are clearly sufficient to sustain the jury's conclusion as to his guilt on the conspiracy count.

### B. *Judge Cooper's Charge and Conduct of the Trial*

#### 1. *The charge.*

Appellants raise several objections to Judge Cooper's charge and supplemental charge to the jury. Most were not objected to below and are plainly without merit. We consider here only two of the objections: first, that Judge Cooper's explanation of the evidence sufficient to establish the existence of a conspiracy was prejudicial to the defendants; and second, that the charge coerced guilty verdicts from the jury.

■ The jury after deliberating for some time requested further instructions from Judge Cooper on the elements necessary to prove a conspiracy. In further explaining the nature of the proof minimally necessary to establish an unlawful agreement Judge Cooper said:

> To establish a conspiracy the government is not required to show that two or more persons sat around a table and then entered into a solemn pact orally or in writing stating that they have formed a conspiracy to violate the law and setting forth details of the plan like an architect's blueprint. It would be extraordinary if ever such a situation existed.
>
> Your common sense will tell you that when men in fact undertake to enter into a criminal conspiracy, much is left to the unexpressed understand-

21. *See* United States v. Calabro, 449 F.2d 885, 890 (2d Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972):

> It is true that almost every aspect of Calabro's conduct is susceptible of an inference other than his participation in the conspiracy. However, as Judge Friendly observed in United States v. Geaney, *supra*, 417 F.2d at 1121, "Pieces of evidence must be viewed not in isolation but in conjunction." A seemingly innocent act, when viewed in the context of surrounding circumstances, may justify an inference of complicity.

That the evidence of Malavarco's complicity is circumstantial is not fatal to the establishment of this complicity. United States v. Ragland, 375 F.2d 471, 477, 478 (2d Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968). *See* Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 90 L.Ed. 150 (1954); United States v. Bowles, 428 F.2d 592, 597 (2d Cir.), cert. denied, 400 U.S. 928, 91 S.Ct. 193, 27 L.Ed.2d 188 (1970).

22. *See* note 21 *supra*.

ing. You could nod your head, that's the same as saying, "Okay with me," or you could say, "I would very much like to be considered as taking under advisement the possibility that I shall entertain your proposition, and having done so I am ready to participate." That's an elongated form of just the affirmance by a nod of the head.[23]

Considering this language in context,[24] we conclude that it was not prejudicial to the appellants. In explaining the difficult concept of conspiracy to the jury, Judge Cooper discussed at length the proposition that actions often speak louder than words and that a specific, tangible agreement in words is not necessary to establish the existence of a conspiracy. The charge in this respect was fair and properly responsive to the jury's request.[25]

■■ Appellants also object to portions of the charge and supplemental charge they believe were coercive.

In his charge Judge Cooper said:

The verdict, whether for acquitted [sic] or for conviction, must be unanimous. Each juror is entitled to his own opinion. You should, however, exchange views with your fellow jurors. That is the very purpose of jury deliberation, 12 jurors, not one.

I heard not long ago that a juror in a case in this building went into the jury room and with arms akimbo said, "This is how I feel and that's it and I don't want to listen to you." And the jury worked on that person for hours.

That wasn't Mr. Justice, that was Mr. Fool. That was the most irresponsible, degrading piece of conduct. That person will be dealt with, as he should.

You have a right to your opinion but you must discuss with one another, you must give each the benefit of your views.

And so the law says that you must listen to the arguments of your fellow jurors, you must consult with one another, you must reach an agreement based solely and wholly on the evidence, if you can do so without violence to your own individual judgment, and to employ that high degree of genuine courage you justifiably expect especially in these perilous times from your public officials.

You should not hesitate to change an opinion which upon a consideration of all the evidence with your fellow jurors appears erroneous. However, if after carefully considering all the evidence and the arguments of your fellow jurors you entertain a conscientious view that differs from others, you are not to yield your convictions simply because you are outnumbered or outweighed.[26]

The appellants all stress the "Mr. Fool" illustration. Although hypothetical illustrations should be avoided because of the likelihood that they may divert the jury, this particular illustration, which well could have been omitted, was not coercive. It was followed immediately by a correct exposition of the law applicable to each juror in his discussions and in the weighing of the evidence in the jury room. Considered in context this instruction was not prejudicial to the defendants. The jury was "properly instructed that each juror's vote must reflect his considered judgment as to how the case is to be decided";[27] no more is required.

23. Transcript at 2995.

24. See United States v. Kahaner, 317 F.2d 459, 479 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

25. See United States v. Jacobs, 431 F.2d 754, 760–762 (2d Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971), where we approved Judge Cooper's charge and supplemental charge on conspiracy against a similar attack as "in all respects fair and proper." Id. at 762. See Transcript of Trial at 1129, 1132–33, 1195–96, 1206–07.

26. Transcript at 2964–65.

27. United States v. Bowles, 428 F.2d 592, 595 (2d Cir.), cert. denied, 400 U.S. 928, 91 S.Ct. 193, 27 L.Ed.2d 188 (1970). See United States v. Martinez, 446 F.2d 118 (2d Cir.), cert. denied, 404 U.S. 944,

■ During the afternoon of November 24, 1971, the jury became trapped in a stalled elevator for approximately one and one-half hours. In speaking to the jury afterwards, Judge Cooper asked them whether they wished to continue deliberations; the jury members concluded thereafter that they did. During this session Judge Cooper said:

Won't you, therefore, take your time when you go back to the jury room, let me have a note as to how you feel about going on? Certainly the case has to be resolved, certainly we have to figure a way whereby you can resolve it calmly, dispassionately, fairly, remembering what is involved here to both sides, and with that in mind we will cooperate to the fullest extent.[28]

Counsel later objected to this comment in the robing room. Judge Cooper

92 S.Ct. 297, 30 L.Ed.2d 259 (1971); United States v. Hynes, 424 F.2d 754 (2d Cir.), cert. denied, 399 U.S. 933, 90 S.Ct. 70, 26 L.Ed.2d 804 (1970).

28. Transcript at 3041.

29. The Court: Members of the jury, it is now about 5:10 and I am most anxious to make it extremely clear to you, as clear as I can possibly make anything clear, that what I said to you about a half hour or so ago in no way, not in any sense whatever, is to run counter to what I pleaded with you, as a judge to a jury, when I concluded yesterday with these words—in other words, what I am about to read to you is what I told you yesterday and it is as true and as vibrant and as full of life and as full of meaning as it was when I uttered it for the first time in this trial: You have a right to your opinion but you must discuss with one another, you must give each the benefit of your views. And so the law says you must listen to the arguments of your fellow jurors, you must consult with one another, you must reach agreement based solely and wholly on the evidence, if you can do so without violence to your own individual judgment and to employ that high degree of genuine courage you justifiably expect, especially in these perilous times, from your public officials, and that includes the judges and the lawyers. You should not hesitate to change an opinion which upon a consideration of all the evidence with your

agreed with the objection, and recharged the jury.[29] Thus whatever coercive effect there was in the first comment was effectively eliminated in the recharge.

2. *Judge Cooper's limitation of cross examination.*

■■ Appellant Cassino claims that he was denied due process by Judge Cooper's limitation of his cross examination of the agent who took his post-arrest confession. Agent Sullivan testified on direct examination to Cassino's post-arrest admissions of his knowledge of and participation in Variano's gambling enterprises. Counsel for Cassino then cross examined Sullivan, bringing out the facts that Cassino was surprised to be arrested, that Cassino had refused to sign a waiver of rights form,[30] that Cassino had participated in a raid on one of Variano's establishments in Octo-

fellow jurors appears erroneous. However, if after carefully considering all the evidence and the arguments of your fellow jurors you entertain a conscientious view that differs from others, you are not to yield your convictions simply because you are outnumbered or outweighed. And of course this instruction applies to each defendant on trial, because you remember I said over and over again that guilt is personal [sic] and the guilt or innocence of each defendant must be determined by you as though he were the only one on trial. *Id.* at 3061–62.

30. Before he confessed Cassino was twice advised of his rights and stated that he understood them. Thus his signature on a waiver form was not necessary to permit the introduction of his confession into evidence. United States v. Speaks, 453 F.2d 966, 968–969 (1st Cir. 1971), cert. denied, 405 U.S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 804 (1972); United States v. Crisp, 435 F.2d 354, 358 (7th Cir. 1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); United States v. McNeil, 140 U.S.App.D.C. 3, 433 F.2d 1109, 1113 (1969); Klingler v. United States, 409 F.2d 299, 308 (8th Cir.), cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); United States v. Hayes, 385 F.2d 375, 377 (4th Cir. 1967), cert. denied, 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106 (1968). *See* United States v. Welch, 455 F.2d 211, 213 (2d Cir. 1972) (per curiam).

ber of 1969, and that Sullivan's interview log did not mention Cassino's confession. Cassino's attorney also tried to suggest that Cassino had been joking when he said that he worked for Variano.

After Cassino's attorney completed his cross examination of Sullivan, the question arose of how to deal with the desire of three of the defendants on trial to bring out the fact that Cassino's confession did not name them. The court resolved this difficulty by permitting the three unnamed defendants to elicit the fact of Cassino's silence as to them without revealing the identities of any defendants named by Cassino. Cassino's attorney then stated that he wanted to "bring out the confession word for word" to "rehabilitate" his client, claiming that portions of the confession exculpated Cassino. Pointing out that counsel had already completed his cross examination, during which he had a copy of Cassino's confession, the court rejected his request to cross examine further with respect to the confession, but did give him permission to cross examine further with respect to other areas.

Thus Judge Cooper did not abuse his discretion in limiting Cassino's right to further cross examine Agent Sullivan, particularly in light of Cassino's failure to *indicate what further questions* he would like to have put to Agent Sullivan.[31] Judge Cooper obviously had to limit carefully the questioning of Agent Sullivan,[32] and under the circumstances he was completely fair to Cassino's counsel.

C. *Alleged Improper Conduct By the Prosecutor*

██ One of the many gifts made to Colligan by Variano was a color televi-

sion set. Colligan claimed that when given the set by Variano he believed it not to be a gift but a purchase, and fully intended to pay Variano for it. The day after receiving the set Colligan told his superior about the incident. Lieutenant Dirschka instructed Colligan to keep the set in his home in case any of the principals in the investigation visited him there. He did not mention the incident in his reports because he felt at the time that the transaction was a purchase rather than a fringe benefit for protecting Variano's gambling operations.

The prosecutor did not elicit from Colligan the story about the television set, which he discovered just prior to the completion of Colligan's direct examination. He explained his decision as follows:

I had a discussion with Lieutenant Colligan as to whether or not we had everything he received from Variano set forth before the jury. He said yes, everything he had received in the way of what he considered a bribe or a gift was set forth. However, he then went on to relate to me the story about a television set yesterday, long after I prepared any bill of particulars with regard to this.

I said, "Undoubtedly this will come out on cross examination and as soon as you are asked one question as to whether you got any gifts whatsoever in this regard, you make it known there is a television set involved and you explain the circumstances of what you consider a purchase and what counsel may consider to be otherwise." [33]

The decision not to elicit the story about the television set was, as the gov-

---

31. *See* United States v. Campbell, 426 F.2d 547, 550 (2d Cir. 1970) ; United States v. Persico, 425 F.2d 1375, 1383–1384 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970) ; United States v. Gorman, 355 F.2d 151, 160–161 (2d Cir. 1965), cert. denied, 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966) ; Commercial Banking Corp. v. Martel, 123 F.2d 846, 847 (2d Cir. 1941).

32. *See* Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

33. Transcript at 732.

ernment concedes in its brief, unwise,[34] but it was not misconduct prejudicial to the defendants. They fully exploited the incident on cross examination. Thus even assuming the story of the set to be material evidence, and even assuming the government's suppression of the story to be deliberate (a questionable assumption), the fact that the jury learned the details of the story precludes a successful challenge. As the Supreme Court said in *Giglio*: "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'"[35] Here clearly the "false testimony" would not in any reasonable likelihood have affected the judgment of the jury.

■ Rattenni further complains that one of Colligan's reports had to be "smoked out by the defendants." The report was a comprehensive report covering Colligan's entire investigation. This report was in essence a compilation of the individual reports Colligan made after each meeting with the defendants. These individual reports were turned over to the defendants prior to the com-

pletion of Colligan's direct testimony. Because the prosecutor was previously unaware of the existence of the compilation, it was not turned over to the defense until a portion of Colligan's cross examination had been completed. Because the report was used by several of defense counsel in cross examination, and because the failure to turn over the report was clearly inadvertent, this alleged suppression likewise does not warrant a new trial.[36]

### D. Appellants' Motions To Sever

■ Appellants Roman, Curico, and Malavarco contend that their trials should have been severed from the trial below. We disagree. Trial judges possess broad discretion in granting motions to sever pursuant to Fed.R.Crim.P. 14;[37] that discretion was not abused here. Each of the appellants was shown to have participated in a common criminal scheme and no prejudice resulted from their joint trial.[38] That they might have had a better chance of acquittal by being separately tried is

34. *See* United States v. Freeman, 302 F.2d 347, 350 (2d Cir. 1962), cert. denied, 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963).

35. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), quoting Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); United States v. Mele, 462 F.2d 918, 924 (2d Cir. 1972) ("At least where the suppression is deliberate, the defendants need only show that the evidence is material and could in any reasonable likelihood have led to a different result on retrial"). *See* United States v. Mayersohn, 452 F.2d 521, 525–526 (2d Cir. 1971); United States v. Freeman, 302 F.2d 347, 350 (2d Cir. 1962), cert. denied, 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963).

36. *See* note 35 *supra*.
Rattenni and Malavarco further complain that the prosecutor knowingly permitted Colligan to testify that he received clothes of less value than he allegedly in fact received. Again, even assuming the suppression to be knowing, the fact that

the evidence allegedly establishing that Colligan received more in clothing from Variano than he testified to was placed before the jury by defense counsel vitiates whatever force this complaint has.

37. Schaffer v. United States, 362 U.S. 511, 513, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); Stilson v. United States, 250 U.S. 583, 585–586, 40 S.Ct. 28, 63 L.Ed. 1154 (1919); United States v. Projansky, 465 F.2d 123, 138 (2d Cir. 1972); United States v. Vega, 458 F.2d 1234, 1236 (2d Cir. 1972); United States v. Borelli, 435 F.2d 500, 502 (2d Cir. 1970), cert. denied, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971); United States v. DeSapio, 435 F.2d 272, 280 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

38. "Reasons for severance are founded on the principle that evidence against one person may not be used against a co-defendant whose crime is unrelated to the others." Schaffer v. United States, 362 U.S. 511, 523, 80 S.Ct. 945, 952, 4 L.Ed. 2d 921 (1960) (Douglas, J., dissenting).

plainly insufficient to justify severance.[39]

■ Malavarco contends that severance should have been granted to him after Agent Sullivan testified as to Cassino's confession. Counsel for Roman, Rattenni, and Parietti brought out from Agent Sullivan the fact that Cassino did not mention their clients in his confession, but did mention other defendants. Malavarco contends that the jury must have inferred that he was one of the other defendants mentioned in Cassino's confession. Judge Cooper promptly and carefully instructed the jury not to speculate as to the "other defendants" mentioned by Cassino.

We conclude that the limiting instructions were sufficient under the circumstances to protect Malavarco's *Bruton* rights and that severance was properly denied. In determining whether a co-defendant's *Bruton* rights are violated in situations analogous to the one before us, courts have interpreted *Bruton* to require reversal only if (1) the testimony concerning the complaining co-defendant is clearly inculpatory,[40] and (2) the testimony is vitally important to the government's case.[41]

Malavarco's contention meets neither test: while the jury might have inferred that one of the "other defendants" mentioned by Agent Sullivan was Malavarco, the jury did not necessarily or even probably have to conclude that the reference was inculpatory since both Cassino and Malavarco were state troopers, and Cassino might have mentioned Malavarco's name only in that context; moreover, the inference that Malavarco was one of the "other defendants" and the further inference that the reference was inculpatory were not vital to the government's case against Malavarco, given the evidence of Malavarco's guilt provided by the declarations of Variano and Rattenni and the testimony of the agents who conducted surveillance of Malavarco.

We have considered the other grounds urged for reversal and conclude that they are without merit and do not require discussion. The judgments of conviction are affirmed.

39. United States v. Fantuzzi, 463 F.2d 683, 687 (2d Cir. 1972) ; United States v. Borelli, 435 F.2d 500, 502 (2d Cir. 1970), cert. denied, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971) ; .United States v. DeSapio, 435 F.2d 272, 280 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971), quoting Tillman v. United States, 406 F.2d 930, 935 (5th Cir.), vacated as to one defendant on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

40. United States v. Deutsch, 451 F.2d 98, 116 (2d Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972) ; United States v. Trudo, 449 F.2d 649, 651–653 (2d Cir. 1971), cert. denied, 405 U.S. 926, 92 S.Ct. 975, 30 L.Ed.2d 799 (1972) ; United States v. Cunningham, 446 F.2d 194, 198–200 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971) ; United States ex rel. Nelson v. Follette, 430 F.2d 1055, 1057 (2d Cir. 1970), cert. denied, Nelson v. Zelker, 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971) ; United States v. Cusumano, 429 F.2d 378, 381 (2d Cir.), cert. denied, Testa v. United States, 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970) ; United States v. Persico, 425 F.2d 1375, 1382–1383 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970) ; United States v. Carella, 411 F.2d 729, 732 (2d Cir.), cert. denied, Erhart v. United States, 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed.2d 112 (1969). *See* Bruton v. United States, 391 U.S. 123, 126, 135–136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

41. Frazier v. Cupp, 394 U.S. 731, 735, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ; Bruton v. United States, 391 U.S. 123, 126, 135–136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ; United States ex rel. Duff v. Zelker, 452 F.2d 1009, 1010 (2d Cir. 1971) ; United States ex rel. Nelson v. Follette, 430 F.2d 1055, 1058–1059 (2d Cir. 1970), cert. denied, Nelson v. Zelker, 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971) ; Wapnick v. United States, 406 F.2d 741, 742–743 (2d Cir. 1969) (per curiam).