**UNITED STATES of America,**
**Appellee,**

v.

**Robert WYLER, Appellant.**

**No. 1074, Docket 71-1937.**

United States Court of Appeals,
Second Circuit.

Argued July 19, 1973.

Decided Nov. 1, 1973.

L. Kevin Sheridan, Asst. U. S. Atty. (Robert Morse, U. S. Atty., E. D. New York, on the brief), for appellee.

Herald Price Fahringer, Buffalo, N. Y. (Laurence A. Schulz and Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., on the brief), for appellant.

Before MOORE and OAKES, Circuit Judges, and TYLER,* District Judge.

TYLER, District Judge.

Appellant Wyler was convicted with nine other defendants after a jury trial in the Eastern District of New York (Mishler, *Ch.J.*) of conspiracy to violate the narcotics laws. 21 U.S.C. §§ 173 and 174. On July 8, 1971, Wyler was sentenced to ten years in prison, consecutive to a New York State sentence he was then serving. Thereafter, Wyler and the other nine defendants appealed to this court, with the result that their convictions were affirmed. United States v. Vega et al., 458 F.2d 1234 (1972). Notwithstanding this affirmance of his conviction, this court thereafter, on July 12, 1972, ordered Wyler's appeal "reinstated" because of his post-affirmance claim of a conflict of interest possessed by the lawyer then representing him on appeal and who had been trial counsel for a co-defendant, Vega. A different panel of this court now having heard Wyler's reinstated appeal, we once again affirm the conviction.

In light of the previous opinions of this court, United States v. Vega, *supra*; see also United States v. Nathan, 476 F. 2d 456, decided March 16, 1973, familiarity with the facts as proved by the government will be assumed.

* Of the Southern District of New York, sitting by designation.

On this reinstated appeal, Wyler makes three arguments: (1) there was insufficient evidence that Wyler was a knowing and purposeful member of the scheme to traffic in cocaine and heroin; (2) the trial judge improperly exercised his discretion in denying him a severance of his case for trial; and (3) he was "denied his Sixth Amendment right to compulsory process of witnesses favorable to the defense." Each of these contentions will be dealt with hereinafter.

I

■ According to Wyler, the government offered no evidence to show that he knew of or participated in the charged conspiracy, which, as proved by the government, can be simply described as a heroin and cocaine business dominated by defendant Torrado. As Wyler views it, the only proof against him dealt with a June 8, 1968 transaction wherein one Estrada, an employee of Torrado, offered to sell some cocaine to Wyler. Wyler concedes that he, "acting as a go-between, obtained some money from another person in the bar and gave it to Estrada." This narrow view overlooks other evidence of importance. There was testimony of a meeting, for example, on June 26, 1968 at the Butterscotchman Lounge. According to the testimony of one Gomez, he was then present during a conversation between Wyler and Boulier having to do with heroin. That conversation, according to Gomez, included a statement by Wyler (referred to as "Bobby the Italian") that he would not be paying any more money for the heroin which he had been buying from Torrado. Furthermore, Gomez testified to a later conversation, apparently in July, 1968, wherein Torrado instructed Boulier to deliver ⅛th kilogram to Bobby Wyler. Accordingly, we have no difficulty in concluding that there was sufficient non-hearsay evidence to permit the trial court to submit the case to the jury, United States v. Geaney, 417 F.2d 1116, at 1120 (2d Cir.

1969), and ample evidence, hearsay and non-hearsay, to convince a jury of Wyler's guilt beyond a reasonable doubt. *Id.* at 1121. Moreover, contrary to the view of our dissenting colleague, we deem this evidence sufficient to support the jury's obvious finding that Wyler was no mere user of heroin and cocaine.

■ It is necessary to deal with a corollary argument advanced by Wyler to the effect that the evidence submitted about him to the grand jury was insufficient to sustain the indictment. As he correctly points out, the only evidence before the grand jury relating to Wyler was the testimony of Oscar Estrada. Before the grand jury, Estrada testified that on June 8, 1968, at the Butterscotchman Lounge he sold Wyler ⅛th of a kilogram of heroin. As noted, his testimony at trial on this transaction was different in that he said that what he sold to Wyler on that day was ⅛th kilogram of cocaine. Not surprisingly, this and another discrepancy were thoroughly explored by Wyler, who, with occasional assistance of attorneys Rosner and Mahler, ably defended himself at trial, on cross-examination of Estrada. It is perhaps sufficient for us to observe that this contention of Wyler is disposed of by the rule of Costello v. United States, 350 U.S. 359 at 363, 76 S.Ct. 406 at 408, 100 L.Ed. 397 (1956), wherein it was held that federal indictments are not "open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury." But, assuming that the indictment is open to challenge for inadequate evidence, Estrada's testimony, even with his error as to the type of hard drug involved, was certainly sufficient to indicate a reasonable probability of Wyler's knowing involvement in the conspiracy charged. See Silverthorne v. United States, 400 F.2d 627 at 634 (9th Cir. 1968), appeal on remand 430 F.2d 675 (1970), cert. denied, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971); United States v. Potash, 332 F.Supp. 730 at 734 (S.D.N.Y.1971).

## II

■■ Prior to his trial, Wyler timely moved for an order severing his case for trial. He renewed this motion orally on the first day of trial. On those motions, as now, Wyler argued in substance that, absent severance, he would be unable to certainly obtain the testimony of certain co-defendants who, he claimed, would have demonstrated his lack of complicity in the conspiracy. Technically, we believe that the severance issue has already been resolved against Wyler by the panel of this court in United States v. Vega, *supra*, 458 F.2d at p. 1236. In any event, focusing upon this issue once again in respect to the peculiar facts pertaining to Wyler, it is only necessary to note that he was able to ask questions about his own involvement during the course of his cross-examination of certain co-defendants who took the stand at trial. For reasons which are obscure to us, it appears to be the view of our dissenting colleague that severance was required in order to permit Wyler to question all of his co-defendants. Even assuming that the remaining defendants would have been willing to testify, we doubt that their answers would have been more impressive than those given by other co-defendants at trial. Without extended discussion, therefore, we conclude that the trial judge was well within his discretion in denying the motions for severance; further, it is clear in hindsight that no prejudice resulted to Wyler by virtue of the judge's rulings. It is, of course, horn-book law that co-conspirators need not be shown to know one another; in this case, this principle has considerable practical importance due to the fact that four of the remaining defendants tried with Wyler were not "wholesalers" or their immediate agents but rather were "retailers" like Wyler.

## III

Appellant also contends that he was unconstitutionally denied the right by the trial judge to issue subpoenas for witnesses and records favorable to his defense. See Washington v. Texas, 388 U.S. 14, 87 S.Ct.1920, 18 L.Ed.2d 1019 (1967). This contention effectively breaks into two separate parts, the first of which is plainly frivolous.

■ In his main brief on appeal, Wyler contended that the trial court erred in refusing to subpoena certain Central Intelligence Agency records and personnel as live witnesses. According to that theory, Wyler obtained money from a third party in order to pay it over to Estrada on June 8th for the cocaine; the third party allegedly was an agent of the CIA operating under the cover name of "Alex Two". In effect, then, the claim of appellant at trial and now is that he had been working for the CIA when he bought the cocaine on June 8th. Passing the inherent incredibility of such a claim, it is plain that the trial judge endeavored to come to a sensible solution of the problem; rather than allow a wholesale production of CIA records and unidentified personnel of that agency, he had the personnel director of the CIA, a Mr. Fred E. Lott, appear and testify for the appellant. (See SM2457–58). Not surprisingly, Mr. Lott's testimony established that the CIA had no record of ever having employed Wyler or any of the other individuals he claimed were CIA employees dealing with him. We have no difficulty, then, in concluding that the trial judge properly exercised his discretion in regard to this aspect of the matter.

■ Apparently surmising that this court would reach such a conclusion, appellant and his counsel raised quite a different contention under this general heading in his reply brief on appeal. Specifically, Wyler therein claimed for the first time that the trial court erred in refusing to subpoena two witnesses, Lucretia Lum from Florida and one Clem Nash from Detroit. According to Wyler, Lucretia Lum could have testified that he, Wyler, was not known as "Bobby the Italian", despite this identification by prosecution witnesses. Nash, a named defendant in the alleged conspiracy (though not on trial with

Wyler), would have testified about some unspecified subjects which would cast in doubt the credibility of witnesses Estrada and Gomez. We have little difficulty with the Nash request, if only because the record is totally unclear that he could have given any helpful testimony to appellant. Thus, the trial judge was well within his discretion to refuse, as he did, to call Nash because Wyler and assisting counsel Rosner were not only distressingly vague as to Nash's potential "evidence" but also aware that Nash might invoke his Fifth Amendment privilege. (SM2458–60)

■ Because the government had offered evidence tending to establish that Wyler was known as "Bobby the Italian" by other conspirators, the question regarding Lucretia Lum is arguably a closer one. Assuming, as Wyler does, that Miss Lum would not have invoked her privilege under the Fifth Amendment, we still note that there was no particular assurance that she, allegedly a girlfriend of principal defendant Torrado, would have been in any position to testify that Wyler was not called "Bobby the Italian". As Wyler himself put it, "I would like to see if she knows who Bobby the Italian is". (SM2461). The trial judge, who struggled constantly through the long trial to pass on Wyler's legion requests for witnesses, was painfully aware of his responsibilities in this area. (See, e. g. SM2008–9; 2343–46; 2458–61.) As applicable Rule 17(b), F. R.Cr.P., indicates by its terms, the trial court is obliged to be satisfied that the production of a desired witness is ". . . necessary to an adequate defense." Unlike the dissent, we cannot find that the aforementioned quotation of Wyler was an "explicit, relevant and important" offer of proof. Wyler at this point said nothing further; hence we are left with the unmistakable inference that Wyler himself had no reason to know what Miss Lum would say about this matter. Earlier, during another colloquy between the court, Wyler and other counsel, it is true that Wyler had stated that he wished to ask Miss Lum

about the "credibility" of Estrada and Gomez. Government counsel immediately responded that he would object—with what we consider to be good reason—to any views which Miss Lum might have as to the credibility of Gomez and Estrada. Moreover, the trial judge thereupon turned to Mr. Rosner, who was then assisting Wyler, saying: "Now, do you want Miss Lum up here . . .?" Rosner replied: "I don't want her up." (SM2345–46). With this state of the record, we cannot say that the trial court abused its discretion in concluding that there was no reasonable certainty that Miss Lum would testify in a manner helpful to Wyler. See United States v. Lepiscopo, 458 F.2d 977, at 978 (10th Cir. 1972); United States v. Panczko, 429 F.2d 683, at 688–689 (7th Cir. 1970).

The judgment of conviction is affirmed.

OAKES, Circuit Judge (dissenting):

I dissent.

I believe Wyler was substantially prejudiced by being tried with other members of the conspiracy. He had timely moved for a severance six months before trial and renewed the motion subsequently. While Wyler may have been a participant in the overall conspiracy, his participation was so quantitatively, if not qualitatively, different from that of the codefendants, at least six of whom were wholesalers and all of whom had major roles, that he would invariably be prejudiced in a trial with them. Indeed, with the exception of one instance where he acted as a runner or go-between in a small sale, Wyler's purchases could as well have been for his own consumption, given the evidence. Of the codefendants who testified, none knew Wyler. With a severance he would have been able to examine all of them. This is precisely the kind of case where Mr. Justice Jackson's remarks on conspiracy trials in Krulewitch v. United States, 336 U.S. 440, 446, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring), which have

been quoted so often that they do not need repetition here, still apply. A separate trial, the trial court acknowledges, would have taken only two days.

I also think the trial court should have subpoenaed both Lucretia Lum and Nash. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The majority states that "there was no particular assurance" that Lum could have testified favorably to Wyler. It goes on to say that because Wyler, representing himself pro se, had made unjustified requests for subpoenas earlier, the trial judge did not abuse his discretion in concluding "there was no reasonable certainty that Miss Lum would testify in a manner helpful to Wyler." I do not agree. The offer of proof was explicit, relevant and important—that Lum would testify that Wyler was not the "Bobby the Italian" referred to by the prosecution witnesses, and perhaps knew who the real "Bobby the Italian" was; that she was very close to Jesus Torrado, the boss of the narcotics chain conspiracy, and hence had reason to know this. There was no question that she was involved in some way with this organization and had indeed testified both in a rape case against Estrada and Gomez, two of the conspirators, and in a narcotics prosecution against her. As for Nash, while perhaps the offer of proof was not explicit, the Government, having alleged that Nash was a coconspirator, should not be permitted to deny the relevance of his testimony as one of the alleged coconspirators. Since the Government itself named him as a coconspirator, the burden should be on it to show the irrelevancy of Nash's testimony.

The evidence of Wyler's involvement in the conspiracy was in any event thin at best. He received a ten year sentence. Because I think he was deprived of due process of law by the denial of his motion to sever and his sixth amendment right to call witnesses in his own behalf, I dissent from the affirmance of his conviction.