**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Alphonse CIRILLO et al., Defendants-
Appellants.**

Nos. 676, 677, 684, 688, 730, 762, 763 and
796, Dockets 73-2426, 73-2615, 73-2554,
73-2796, 73-2555, 73-2644, 73-2645 and
73-2635.

United States Court of Appeals,
Second Circuit.

Argued Feb. 14, 1974.

Decided May 7, 1974.

Harold Borg, Kew Gardens, N. Y. (Arnold E. Wallach, New York City, of counsel), for appellant Cirillo.

Stephen R. Laifer, Brooklyn, N. Y., for appellant Murphy.

Irving Sable, Far Rockaway, N. Y., for appellants Sorrentino and Cesare.

Jacob P. Lefkowitz, New York City, for appellant Venetucci.

Paul E. Warburgh, Jr., New York City (Kassner & Detsky, New York City, of counsel), for appellant Gutierrez.

Charles T. McKinney, New York City, for appellant Lilienthal.

Julius M. Wasserstein, Brooklyn, N. Y., for appellant Gaber.

Guy L. Heinemann, Asst. U. S. Atty. (Edward John Boyd, V, U. S. Atty. E. D. New York, Raymond J. Dearie, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before MEDINA, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

On this appeal we encounter a narcotic distribution conspiracy of the familiar "chain type" involving sophisticated suppliers, middlemen and customers who dealt in substantial amounts of heroin, conducting their business through use of coded narcotics trade language or jargon in which innocent phrases were used to describe heroin, prices and parties. After a jury trial before Judge Orrin G Judd of the Eastern District of New York all appellants were found guilty of conspiracy to distribute heroin in violation of 21 U.S.C. § 846 (Count 9). Additionally appellants were convicted on other counts as follows:

| Counts | Appellants [1] |
|---|---|
| 1: (possession with intent to distribute 1 kilogram of heroin) | Cirillo and Murphy |
| 2: (distribution of the same kilogram of heroin) | Cirillo, Murphy and Sorrentino |
| 3 and 4: (possession of the same kilogram with intent to distribute and attempted distribution) | Venetucci |
| 5 and 6: (possession and distribution of ½ kilogram of heroin) | Lilienthal |
| 7: (attempted distribution of the ½ kilogram) | Cirillo, Murphy and Sorrentino |
| 8: (attempt to possess the ½ kilogram) | Cesare |

Finding insufficient evidence of guilt, we reverse the convictions of appellants Gutierrez and Gaber. The convictions of all the other appellants are affirmed.

The government's proof consisted largely of tapes and transcripts of some 40 intercepted conversations occurring over the home telephones of Cirillo and Sorrentino, supplemented by testimony of surveilling agents and a video tape of a meeting of four of the conspirators. Initial authorization for the wiretap of Cirillo's phone was given in a warrant order issued on October 31, 1972, by Justice J. Irwin Shapiro of the New York State Supreme Court, Appellate

---

1. Appellants were sentenced as follows:
 Cirillo —14 years, 9 months on Counts 1 and 2 (concurrent) and 10 years special parole; 10 years on Counts 7 and 9 (concurrent but consecutive to sentences on Counts 1 and 2) and 10 years special parole; $10,000 fine on Count 9.
 Murphy —10 years on Counts 1, 2, 7 and 9 (concurrent) and 7 years special parole; $5,000 fine on Count 9.
 Sorrentino—10 years on Counts 2, 7 and 9 (concurrent) and 7 years special parole; $5,000 fine on Count 9.
 Venetucci —9 years on Counts 3, 4 and 9 (concurrent) and 7 years special parole.
 Lilienthal —8 years on Counts 5, 6 and 9 (concurrent) and 5 years special parole; $2,500 fine on Count 9.
 Cesare —5 years on Counts 8 and 9 and 5 years special parole.
 Gutierrez —5 years on Count 9 and 5 years special parole.
 Gaber —5 years on Count 9 and 5 years special parole.
 Presently all appellants except Cirillo are free on bail pending decision of their appeal.

Division, pursuant to New York's eavesdropping statute, N.Y.C.P.L. § 700.05 et seq., after he found on the basis of affidavits submitted by the Kings County District Attorney and a state police detective, that there was probable cause to believe Cirillo was committing narcotics offenses and that evidence of these offenses could be obtained by wiretapping Cirillo's phone. This warrant was extended for four additional 30-day periods by Justice Rabin of the Appellate Division.

Initial authorization for the wiretap of Sorrentino's phone was given in a warrant issued on January 25, 1973, pursuant to the New York statute by Justice Irwin Brownstein of the New York State Supreme Court, which was extended for two additional 30-day periods.

The evidence, viewed in the light most favorable to the government, reveals the following: At 7:00 A.M. on January 18, 1973, Cirillo called Sorrentino and said he wanted to see Sorrentino and "Bobby" (Venetucci). Later that morning Sorrentino and Venetucci spent two hours at Cirillo's home in Little Neck, New York. Thereafter Sorrentino phoned Cirillo to ask whether he should "take the kid out of school" at around 4:00 P.M., to which Cirillo replied, "No, its figured most likely, like the kids going to school tonight." James Garcia, a detective with the New York City Police Department, testified, on the basis of his extensive experience in narcotics investigations, that he would interpret the "kids going to school" language as narcotics coded vocabulary for delivering narcotics.

As the result of a further phone call Cirillo, carrying a rolled up brown paper bag, a type of unobstrusive container frequently used for transportation of narcotics, and accompanied by Murphy, met at 10:30 P.M. with Sorrentino at the apartment of the latter's mother on West 8th Street where they were joined by Venetucci, who arrived at about 11:30 P.M. and left 15 minutes later. Venetucci drove directly to 120 Bay 14th Street in Brooklyn where he met appellant Frank Gutierrez on the street. Both then spent two hours in Gutierrez's apartment, following which Venetucci returned to West 8th Street and Avenue U, where he was seen arguing on the street with Sorrentino, Cirillo, and Murphy.

On the next day, January 19, a series of phone conversations between Cirillo and Sorrentino (during one of which "Bobby" Venetucci was present on Sorrentino's end of the wire) revealed that the argument had arisen because of Venetucci's failure to come up with the money for the narcotics that had been delivered to him the night before by Cirillo, Murphy, and Sorrentino. Venetucci had been unable to locate his "partner" who was supposed to make payment. Sorrentino reported to Cirillo that although Venetucci called from "Bay 14th" (Gutierrez's address), the money had not been received. Sorrentino assured Cirillo that he had told "Bobby" (Venetucci) that Cirillo would not take the "thing" back but wanted the agreed price of $30,000. (At that time the market price for a kilogram of 50% pure heroin ranged from $25,000 to $38,000.) In an effort to obtain the purchase price, a meeting was held that night between Cirillo, Murphy, and Sorrentino, followed by a Sorrentino-Venetucci meeting. The upshot was that while "Bobby" (Venetucci) was finally able to reach his partner "Frankie" by telephone, neither "Bobby" nor "Frankie" could produce the money. Meanwhile Sorrentino expressed concern that the "stuff" (narcotics) was still in Venetucci's house.

The efforts to obtain payment of the $30,000 price for the narcotics continued with Cirillo, the supplier, putting pressure on Sorrentino, the middleman, and the latter in turn pressing Venetucci, who supposedly was looking to his "partner" for payment. On the afternoon of January 22, Venetucci went to Grace's Discount Dress Shop on 11th Avenue in Brooklyn, owned by the wife of Gutierrez, and shortly thereafter Gutierrez en-

tered. Two hours later Venetucci left the shop but returned within a half hour when, before reentering, he walked up and down the opposite side of the street in an apparent effort to determine whether he was being followed. Venetucci finally left the shop at 6:00 P.M. and proceeded in his automobile to Staten Island, driving evasively when he spotted surveillance agents behind him.

By January 25, still unpaid, Cirillo and Sorrentino, who were beginning to lose their patience, resolved to give "Bobby" (Venetucci) a "good workout" and then get the "dress off him" (i. e., secure the return of the narcotics). In this they succeeded, for on the evening of January 26 Sorrentino, Murphy, and Cirillo, who was carrying a brown paper bag, all entered Sorrentino's house in Brooklyn. Three days later Venetucci was told by Sorrentino that "they got rid of it for 22" (i. e., sold the narcotics for $22,000), leaving an $8,000 balance, which Venetucci and his partner were expected to pay. Negotiations regarding the $8,000 deficit followed, with Venetucci trying to persuade Cirillo and the "other guy" to absorb half the loss on the understanding that Sorrentino and Venetucci would make up the other half. Cirillo, however, kept insisting that Sorrentino, Venetucci and "Frankie" pay the entire $8,000.

Discouraged but apparently not resolved to abandon their business relationship, Sorrentino and Cirillo, on March 9, 1973, began discussing another transaction. At 5:45 P.M. on that date Sorrentino advised Cirillo by phone that he had "met some nice people" who thought the "figure" for the "dresses" (i. e., the price for narcotics offered by Cirillo and Sorrentino) was "very good." Several days later, on March 14th, Sorrentino called Cirillo and ordered another "dress" which, according to Detective Garcia, meant another order of narcotics. At this point Cesare, the prospective purchaser, appeared on the scene and asked Sorrentino for delivery of "a sample of that dress." Upon receiving this message from Sorrentino, Cirillo

went into action. He called Lilienthal's home and, upon learning that "Ted" (Lilienthal) was not expected home until 7:00 P.M., left a message instructing Ted to bring him back "those income tax forms, the one . . . half filled out . . . ." (i. e., a half-kilo of heroin). With a view to making the purchase Cesare, accompanied by Gaber, proceeded to the White Castle parking lot near Sorrentino's home where they waited in vain for $3\frac{1}{2}$ hours for the narcotics to be supplied by Lilienthal and departed only after Sorrentino and Cirillo were unable to locate the supplier (Lilienthal).

On the following day, March 15th, Cirillo reached Lilienthal by phone and in response to his request for the "paper that I half filled out" (half-kilo of narcotics) Lilienthal indicated that he had it. Shortly thereafter Lilienthal visited Cirillo's residence, apparently for the purpose of delivering the half-kilo. Cirillo then called Sorrentino to advise that he and "Murph" would go to Sorrentino's residence. Sorrentino then told Cesare, the prospective customer for the half kilo, to call back some time after 7:30 P.M.

At 7:15 P.M. on March 15th Cirillo and Murphy, intending to rendezvous with Sorrentino for the narcotics delivery, entered the parking lot near Sorrentino's house where they were promptly arrested by federal narcotics agents and New York police. A search revealed a half-kilo of heroin and small quantities of cocaine in their possession. The area was quickly cleared in order not to arouse Sorrentino's suspicions. At 8:00 P.M. Sorrentino informed Cesare by phone that he was still waiting for his "friends" (i. e., Cirillo and Murphy) to get there.

At approximately 10:00 P.M. on March 14th Cesare, the prospective customer, together with Gaber and an individual identified as Jerry Collins, arrived at Sorrentino's house. Cesare and Gaber went inside and exited with Sorrentino at 10:45 P.M. Sorrentino talked with Cesare, Gaber and Collins in the

parking lot outside his house for about 45 minutes before he got in his own car and drove around for approximately a half hour. When Sorrentino returned, all four men went to a nearby restaurant until approximately midnight when, after making a call from a nearby public telephone booth, Sorrentino went back into his residence and the other three men drove off in their car. At this point the car driven by Cesare was stopped by a narcotics agent and, when all the occupants were asked to produce identification, Gaber said that they were only in the area to see "Brother." Cesare added, "[Y]eah, Brother Salvatore Sorrentino."

In addition to the tapes and transcripts and the testimony of the surveilling agents, the government introduced the items seized from Cirillo and Murphy on the evening of March 15th, which included the brown paper bag, bag of half kilo of heroin, a small bag of cocaine taken from Cirillo, and a small amount of cocaine wrapped in tin foil that had been taken from Murphy.

On July 27, 1973, the jury returned a verdict finding all appellants guilty of conspiracy to distribute narcotics and various appellants guilty of narcotic offenses as shown above. However, Gutierrez was found not guilty of attempting to possess narcotics in connection with the January transaction and Gaber was found not guilty of attempting to possess narcotics in connection with the March transaction. We turn to the numerous claims of error asserted on this appeal.

## DISCUSSION

### Use of Wiretap Evidence

■ Several appellants challenge the constitutionality of the New York State eavesdrop statute, N.Y.C.P.L. § 700.05, et seq. However, the provisions of that statute are authorized by and conform to similar provisions of the federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, see 18 U.S.C. §§ 2516(2), 2518 (1970), which we held to be constitutional in United States v. Tortorello, 480 F.2d 764 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). See also United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973). For the reasons stated in *Tortorello* we reject the constitutional claim and turn to the other wiretap issues raised by appellants.

### (a) *Validity of Original Wiretap Order*

■ The first warrant order authorizing a wiretap of Cirillo's home phone, which was issued on October 31, 1972, and broadly authorized interception until November 29, 1972, of communications of types particularly described, contained no direction that the interception should be conducted "in such a way as to minimize the interception of communications not otherwise subject to eavesdropping," as required by § 700.30(7) of the statute, see N.Y.C.P.L. § 700.30(7).[2] Several appellants join in Cirillo's argument that the omission of a minimization directive rendered this initial order fatally defective so that any conversations intercepted as a result of it or its subsequent extensions[3] should have been held inadmissible at trial. We disagree.

The first six paragraphs of § 700.30 of the state statute limit the scope of an eavesdropping warrant by requiring it to specify, among other things (1) the name of the person, if known, whose communications are to be intercepted,

2. Section 700.30 provides:
 "An eavesdropping warrant must contain:
 \* \* \* \* \*
 "7. A provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to eavesdropping under this article, and must terminate upon attainment of the authorized objective, or in any event in thirty days; . . . ."

3. Since the application for these extensions was based on conversations intercepted as a result of the first order, if the first order were invalid, the subsequent extensions would be "tainted" by the primary illegality.

(2) the nature and location of the communications facilities as to which authority to intercept is granted, (3) a particular description of the type of communications sought to be intercepted, (4) a statement of the particular designated offense to which they relate, (5) the identity of the law enforcement agency authorized to intercept the communications, and (6) the period of time during which the interception is authorized. Paragraph 7 then provides that the warrant must also contain the above-quoted direction to "minimize" the interception of non-pertinent conversations. Recognizing that paragraph 7 is essentially a summation of "the more specific requirements of 700.30(1)–(6), all of which lead to 'minimization,'" we held in United States v. Manfredi, 488 F.2d 588, at 598 (2d Cir. 1973), that, when the orders and supporting affidavits are construed in "a commonsense and realistic fashion," see United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), mere omission of the "talismanic minimization language" from a wiretap order otherwise in compliance with the statute would not render the warrant invalid under state law, which governs, at least where the supporting affidavits evidenced an actual knowledge of the minimization requirement and an agreement to abide by it. See People v. Solomon, 74 Misc.2d 926, 346 N.Y.S.2d 938, 941 (Sup.Ct. 1973). While here the supporting affidavits contained no specific agreement "to limit the seizure of conversations to those specifically pertaining to the [alleged] Penal Law violations," as the affidavit did in *Manfredi,* there is other convincing evidence that the officers conducting the wiretap were aware of the minimization requirement and abided by it.

The investigation of Cirillo was conducted jointly by the District Attorney for Kings County and the Federal Bureau of Narcotics and Dangerous Drugs (BNDD). Martin Hershey, the assistant in charge of the Narcotics Bureau in the King's County District Attorney's Office who directed the investigation, Alexander Dovetko, a special agent with BNDD who supervised the federal agents engaged in the investigation, and Guy Heinemann, the Assistant United States Attorney for the Eastern District who also participated in the joint investigation, all submitted affidavits stating that they were aware of the minimization requirement before the first Cirillo warrant was obtained and that minimization instructions were given to the officers and agents conducting the tap, who were ordered to turn off all recording and listening devices whenever they were able to determine that nonpertinent conversations were being intercepted. Agent Dovetko visited the Cirillo wiretap almost daily from its inception and personally observed agents and officers complying with these instructions. Furthermore, during the period covered by the first warrant, the listening and recording of over a quarter of the completed calls was terminated as soon as nonpertinency was determined.[4] These logs, which we have reviewed, support Dovetko's conclusions.[5]

In other contexts New York appellate courts have excused purely technical defects in the form of a search warrant that has been executed according to statutory requirements. Compare People v. Glen, 30 N.Y.2d 252, 331 N.Y.S.2d 656, 282 N.E.2d 614, cert. denied sub nom.

---

4. The affidavit stated that "[o]f 496 telephone calls made or received, 120 were incomplete (no answer, busy or wrong number). Approximately 287 were listened to completely and approximately 93 were listened to only initially and then turned off when it was determined that they were non-pertinent."

5. Termination for non-pertinency is indicated on the logs by the letters "N/P." When-

ever these letters appear, there is no further description of the conversation in the log and the log indicates, by showing that only one or two feet of tape elapsed during that particular interception, that the recording and monitoring devices were shut off as soon as the determination of non-pertinency had been made.

Baker v. New York, 409 U.S. 849, 93 S. Ct. 58, 34 L.Ed.2d 91 (1972) (the "fact that the warrant would on its face authorize an improper search does not undo it for all purposes") with People v. Varney, 32 A.D.2d 181, 301 N.Y.S.2d 330 (1969) (technical defects may be overlooked where search is conducted lawfully). The omission of a minimization directive was a "technical defect" under the circumstances of this case where its absence could not, assuming proper attention to the provisions of the warrant, lead to a greater invasion of privacy than was justified by probable cause. Cf. Smith v. United States, 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959) (deficiencies are "technical" where no substantial rights are involved). Since the first order in this case was in "substantial compliance" with the statute we hold that it was valid. Compare *Manfredi, supra*, with United States v. Poeta, 455 F.2d 117, 121 (2d Cir.), cert. denied, 406 U.S. 948, 92 S.Ct. 2041, 32 L. Ed.2d 337 (1972) and United States v. Rizzo, 492 F.2d 443 (2d Cir. 1974).

(b) *Failure to Hold a Minimization Hearing*

■ Appellants next argue that the district court should not have denied their motions to suppress the wiretap evidence without first holding an evidentiary hearing to determine whether minimization had in fact been achieved during the entire course of the wiretap of the Cirillo and Sorrentino phones. In denying the motions to suppress the district court relied on the Dovetko, Hershey and Heinemann affidavits and on his own review of the logs kept during the Cirillo and Sorrentino wiretaps.

The affidavits disclose in detail a clear awareness of and adherence to the minimization requirement. The Dovetko affidavit showed further that at all times the Cirillo and Sorrentino wiretap plants were actively manned and that of the 2774 conversations initially intercepted only 1526 conversations were listened to completely, "the agents and officers having believed at the time that the [1526] conversations were pertinent to narcotics trafficking or other criminal activity." [6] Despite the ample opportunity to review the detailed and complete logs, which were made available, and to compare them with the tapes, which were also made available, appellants made no attempt to challenge the foregoing statistics or to show that any of the conversations listened to were nonpertinent to the government's investigation. In light of this failure, we hold that the affidavits supplemented by the logs and tapes were sufficient to establish a prima facie showing of compliance with the statutory minimization directive. See United States v. Rizzo, 491 F. 2d 215 at 217 (2d Cir. 1974). Indeed, the prima facie showing is even stronger

---

**6.** The affidavit stated :

"Special Agent Nicholas Alleva and Special Agent William Malarney, have reviewed the logs for both the Cirillo and Sorrentino wiretaps for their entire periods of interception. They have analyzed those wiretaps to assist the Court in determining whether there was proper minimization. On the Cirillo wiretap plant, approximately 1496 telephone calls were made to or from the Cirillo telephone. Of these, 297 were incomplete (busy, no answer, or wrong number). This leaves approximately 1199 actual telephone conversations. Of these, 688 were listened to completely, the agents and officers having believed at the time that the conversations were pertinent to narcotics trafficking or other criminal activity. 511 telephone calls were initially listened to and determined to be nonpertinent whereupon they were not recorded or listened to. In some instances, some of these telephone conversations were relistened to periodically to determine that the conversations continued to be nonpertinent. On the Sorrentino wiretap plant operation, approximately 2184 telephone calls were made to or from the Sorrentino phone. Of these, 599 were incomplete (busy, no answer, or wrong number), leaving approximately 1585 actual telephone conversations. Of these, 838 were listened to completely because they were believed to be pertinent at the time. 747 were initially listened to and determined to be nonpertinent whereupon they were not recorded or listened to. In some instances, some of these telephone conversations were re-listened to to insure that they continued to be nonpertinent."

here than in *Rizzo,* which also upheld a wiretap conducted pursuant to the New York statute. There the state police detective who supervised the wiretap merely asserted at a suppression hearing that both monitoring and recording were stopped when it had been determined that a conversation was "not pertinent." While logs had been kept, no attempt was made to present a detailed analysis of these logs, as did the Dovetko affidavit here.

The affidavits submitted to the district court, supplemented by the logs, were more than adequate to show a good faith effort to achieve minimization.[7] In the absence of any evidence that a substantial number of nonpertinent conversations had been intercepted unreasonably, the court was justified in denying appellants' suppression motions without holding a full adversary-type hearing.

#### (c) *"Expert" Interpretation of Narcotics Jargon*

■ Appellants, in the intercepted telephone conversations, never referred explicitly to heroin or narcotics but used such code words and terms as "kids out of school," "stuff," "dresses," or "half filled out income tax forms." New York City Police Detective Garcia, who had participated in over 100 narcotics investigations and had testified as an expert interpreter of narcotics jargon in five different narcotics cases, testified that in his opinion these terms were being used by appellants as disguised references to narcotics. Appellants do not object to Garcia's qualifications but argue that his interpretations should have been excluded as mere speculation or an invasion of the province of the jury. A similar argument was rejected by us in United States v. Borrone-Iglar, 468 F.2d 419, 421 (2d Cir.), cert. denied,

410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1972). We see no reason to depart from that holding here, particularly since the district court instructed the jury that it was not obliged to accept Garcia's interpretations and was free to draw its own conclusions concerning the meaning of the words used by appellants.

#### (d) *"Surprise" Disclosure of Venetucci Conversations*

Venetucci attacks the introduction at trial of two conversations between him and Sorrentino, which were intercepted shortly after the wiretap of Sorrentino's phone had begun on January 29, 1973. The basis for this objection is the failure of the prosecutor, Assistant U.S. Attorney Heinemann, to make any pretrial disclosure that these conversations had been intercepted.

Venetucci alleges that Heinemann represented to him on two occasions that none of the government's tapes or transcripts contained any conversation participated in by Venetucci. The first occasion was on May 17, 1973, when, in response to discovery motions, Heinemann agreed to furnish not only the wiretap orders with their supporting affidavits but also those transcripts of tapes that had actually been compiled, and to make all tapes and logs available for listening and inspection. Although Heinemann is alleged to have stated on that date that none of the government's tapes contained any Venetucci conversations, Heinemann did not recall having made any such statement. Before trial Heinemann, after stating that he expected all "of the conversations now intended to be used by the government in its direct case to be forwarded to defense counsel," furnished to Venetucci's counsel approximately 90 transcripts of tape recorded conversations, none of which

---

7. Even assuming *arguendo* that some of the conversations completely listened to were in fact nonpertinent, the surveillance would not necessarily have violated the minimization requirement of the statute, assuming a good faith effort had been made to achieve such minimization. Compare United States v. Bynum, 485 F.2d 490, 500–502 (2d Cir. 1973) with United States v. Fino, 478 F.2d 35 (2d Cir. 1973) and United States v. Tortorello, 480 F.2d 764 (2d Cir. 1973).

contained any Venetucci conversations. The second occasion occurred after the trial had begun on July 9 when Venetucci's counsel moved for a mistrial on the ground that Heinemann had implied in his opening statement to the jury that the government actually did have tapes of Venetucci's conversations · which would incriminate him.[8] However, responding to the court's inquiry as to whether he meant to refer to wiretaps of Venetucci conversations, Heinemann had said "No, I don't think there is anything I said to indicate that."

Heinemann did not disclose that tapes of Venetucci conversations existed until the fifth day of appellants' trial when he informed the court that he had discovered the tapes on the previous evening in reviewing the logs kept during the Sorrentino wiretap. Heinemann subsequently offered, and the district court admitted, the transcripts and tapes of two conversations between Sorrentino and Venetucci which occurred on January 29, 1973 and on February 1, 1973, respectively, concerning their joint obligation to make up to Cirillo the $8,000 deficit resulting from the sale of the first lot of narcotics at $22,000 instead of the $30,000 which Venetucci was to pay for it. Venetucci argues that he was prejudiced by this delayed "bombshell" because (1) he was denied any opportunity to participate in a pretrial suppression motion and (2) his counsel was misled in the preparation of his own opening statement, where he emphasized . that, despite the government's extensive electronic surveillance, no Venetucci conversation had been intercepted.

We agree with Venuetucci that the government should have produced the transcripts of his conversations with Sorrentino prior to trial in response to his explicit discovery requests, see United States v. Crisona, 416 F.2d 107 (2d Cir. 1969), cert. denied, 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970). However, we are persuaded that Heinemann's representations were in good faith and resulted from oversight on the government's part. We further doubt that Heinemann categorically conceded on May 17 that none of the one or two-hour reels in the government's possession, of which there were approximately 200, contained any Venetucci conversations.

At least two and a half months before trial the government made the logs of the Cirillo and Sorrentino wiretaps readily available to defense counsel. Our review of these logs reveals that identification of each caller is neither difficult nor particularly time consuming. In each instance where a call was intercepted the log entry identified the parties (where identifiable) before giving a . brief description of the conversation. Indeed, on the very third page of the Sorrentino logs there is a log entry, highlighted by two asterisks, which reads, "MO *Bobby*, MI *Brother—Bobby* and *Brother* discuss 'kilo' they took a loss on. . . ."[9] (emphasis added). All counsel were at all times aware that "Bobby" and "Brother" were the nicknames for Venetucci and Sorrentino, respectively.

Even assuming that Venetucci was misled by the government into believing that there were no tapes of his conversations—an assumption that is somewhat implausible, since he probably knew that he had talked with Sorrentino over the latter's phone—no real prejudice is shown. His claim that the delayed dis-

---

8. In moving for a mistrial, counsel for Venetucci referred to Heinemann's statement that: .

"Later it became clear exactly how much money was to be paid for the heroin that was brought to · Sorrentino's mother's house ·that night (i. e. January 18). $30,000. And $10,000 was ultimately the payment that was demanded, Bobby Venetucci, as a sign of his good faith. This we

know because the defendants talked about it on the telephone, and the telephone of Alphonse Cirillo during January, 1973, was under electronic surveillance by court order."

9. "MO Bobby, MI Brother" is shorthand for Male/Out (i. e., male calling from outside) to Male/In (i. e., male inside receiving call).

closure denied him the opportunity to make his own pretrial attack on the validity of the wiretap orders or on the conduct of the wiretap operation [10] borders on the frivolous. Nothing prevented his doing so, once the transcripts were offered. Yet he failed even to ask for an adjournment or continuance. Nor did the apparent contradiction of his counsel's opening statement by the two Venetucci-Sorrentino taped conversations call for a mistrial. See United States v. Allsenberrie, 424 F.2d 1209, 1215 (7th Cir. 1970); Pierce v. United States, 414 F.2d 163, 169 (5th Cir.), cert. denied, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969). We are not here concerned with such vital matters as a defendant's decision to take the stand, which might result in substantial and irrevocable prejudice. See United States v. Padrone, 406 F.2d 560 (2d Cir. 1969). Any possibility that the jury might believe that Venetucci's counsel deliberately tried to mislead them in his opening could have been dissipated by the court's explaining to the jury what had happened. Yet Venetucci made no request for an explanation. Under the circumstances the admission of the Venetucci transcripts was not reversible error.

*Sufficiency of the Evidence*

■■ Under familiar principles, the trial court was required, before permitting the jury to consider hearsay declarations of one alleged conspirator as evidence against his alleged co-conspirator, to find by a fair preponderance of *non*-hearsay evidence that the latter was a party to the conspiracy. See Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Geaney, 417 F.2d 1116 (2d Cir.), cert. denied sub nom. Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1969). Otherwise, a defendant

could be convicted solely on the basis of hearsay evidence which he had had no opportunity to impeach or refute. See Flintkote Co. v. Lysfjord, 246 F.2d 368, 387 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). While the government's non-hearsay evidence against an alleged co-conspirator may be entirely circumstantial, see United States v. Garguilo, 310 F.2d 249, 253 (2d Cir. 1962), mere association with persons engaged in a criminal enterprise or even presence at the scene of their crime will ordinarily not be enough. There must be some basis for inferring that the defendant knew about the enterprise and intended to participate in it or to make it succeed. Compare United States v. Cimino, 321 F.2d 509 (2d Cir. 1963), cert. denied, 375 U.S. 974, 84 S. Ct. 491, 11 L.Ed.2d 418 (1964) ("mere meeting was no evidence [that persons were] conspirators") and United States v. Fantuzzi, 463 F.2d 683 (2d Cir. 1972) with United States v. Cassino, 467 F.2d 610 (2d Cir. 1972), cert. denied, 410 U.S. 913, 93 S.Ct. 959, 35 L.Ed.2d 276 (1973).

As to most defendants this threshold requirement as to admissibility of hearsay declarations of co-conspirators was clearly met. The tapes, transcripts, surveillance, and other circumstantial evidence provided overwhelming non-hearsay evidence of a conspiracy to distribute heroin in which Cirillo and Murphy were suppliers, Sorrentino was a middleman, and Venetucci and Cesare were customers. Lilienthal, Gutierrez and Gaber argue, however, that there was insufficient non-hearsay evidence to permit the trial court to find by a fair preponderance of the evidence, which is the governing standard, that they had intended to participate in either the January or March transactions. Therefore, they say, it was reversible error to permit the jury to consider the incriminat-

10. Venetucci asserts that his arguments against the wiretap would have been entirely different from those actually raised by the other defendants. He says he would have focused on the New York rather than the federal legislation (although the New York legislation was clearly authorized and conformed to the federal legislation), on the existence of probable cause for the first order (rather than its form) and the numerous extensions of the first order. We have considered these arguments but find them insufficient to change our already-expressed views.

ing hearsay declarations of the other co-defendants as evidence against them.

### (a) *Lilienthal*

The non-hearsay evidence of Lilienthal's participation in the March transaction was clearly sufficient to permit the introduction of statements by co-conspirators in furtherance of the conspiracy. The principal item was Lilienthal's devastatingly incriminatory telephone conversation with Cirillo on March 15 in which Cirillo asked "I got to—I got to have it before the income tax is filled out. You got the paper that I half filled out?" (i. e., have you got the half kilo of heroin?), to which Lilienthal responded "Oh yeah, yeah, yeah," and advised Cirillo that he would stop by in about an hour. In a short while Lilienthal left his residence and later in the day his car was seen at Cirillo's house. Shortly after Lilienthal's visit to Cirillo's house, Cirillo and Murphy went to the White Castle parking lot near Sorrentino's house where they had failed to appear on the previous night because Cirillo had been unable to communicate to Lilienthal his request for those "half filled out" income tax forms (i. e., the half kilo of heroin). When they arrived at the parking lot Cirillo and Murphy were arrested and a package containing a half kilo of heroin was discovered on Cirillo.

From this non-hearsay evidence, including Lilienthal's own statements and conduct, the jury could infer that he agreed to and did supply to Cirillo the half kilo of heroin needed for sale in the chain of distribution. The court acted properly, therefore, in admitting hearsay statements of co-conspirators made in furtherance of the conspiracy, including Cirillo's "statement to Sorrentino" during the aborted January transaction that "Teddy" (Lilienthal) was a supplier who was always a "million percent, nothing ever goes wrong" and another statement by Cirillo to Sorrentino before the March transaction to the effect that "my friend Ted [has] got some papers for you," (i. e., some heroin).

These statements confirmed the non-hearsay evidence surrounding the meeting and warranted the jury's finding beyond a reasonable doubt that Lilienthal was a member of the conspiracy and a participant in the March transaction. See United States v. Manfredi, 488 F.2d 588 (2d Cir. 1973); United States v. Ruiz, 477 F.2d 918 (2d Cir. 1973); United States v. Calabro, 449 F.2d 885 (2d Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972).

### (b) *Gutierrez*

Unlike Lilienthal, Gutierrez was never heard to discuss narcotics with any of the conspirators. The only independent non-hearsay evidence of Gutierrez's possible participation in the conspiracy related to the aborted January, 1973, transaction. On January 18th Venetucci, immediately after leaving his rendezvous with Cirillo, Murphy and Sorrentino at Sorrentino's mother's apartment, for two hours visited Gutierrez's home. At the conclusion of that meeting Venetucci drove back to rejoin Cirillo, Murphy and Sorrentino. On January 22nd Venetucci visited with Gutierrez for four hours at the dress store of the latter's wife, with an interruption when Venetucci left and then returned only after checking for surveillance. Venetucci finally departed, driving evasively to Staten Island. There was no evidence whatsoever of what was discussed and of what transpired at these meetings, or of any possession of narcotics by Gutierrez. Nor was there any non-hearsay evidence of any participation by him in any purchase or sale. Clearly this proof was insufficient to permit the court to find by a fair preponderance that he had participated.

While the two visits raised suspicion, suspicion is not enough. For all we know Venetucci may have visited Gutierrez in an unsuccessful effort to induce him to become a member of the conspiracy. Possibly he was visiting him in an unsuccessful effort to borrow the money he needed in order to fulfill his unlawful

commitment to Sorrentino and Cirillo. Absent some proof of knowing participation by Gutierrez in the unlawful venture we can conceive of any number of perfectly legitimate conversations or transactions that might have been the subject of the visits. Relying on United States v. Manfredi, *supra,* the government contends that in addition to Venetucci's visits there was circumstantial evidence in the form of "verbal acts" by Sorrentino that showed Gutierrez's participation in the conspiracy. It is true that in several Sorrentino-Cirillo telephone conversations Sorrentino referred to "Frankie" Venetucci's "partner." But these statements were clearly hearsay as to Gutierrez, who was not a party to the conversations and had no opportunity to cross-examine the declarant. They were therefore inadmissible against him in the absence of non-hearsay proof of his conscious participation in the conspiracy. To involve Gutierrez by reason of these references would be to sanction a finding of guilt on the basis of nothing more than association, which is impermissible. Hearsay cannot be used as a supplement to, much less as a substitute for, insufficient non-hearsay proof.

 Although *Manfredi* went quite far in admitting "verbal acts" of a co-conspirator, it is clearly distinguishable from the present case and cannot be expanded to admit Sorrentino's hearsay statements. In *Manfredi* the statements were those of the defendant Joseph La-Cosa regarding *his own personal relations* with Manfredi as a narcotics supplier and could be coupled with his own evasive personal conduct upon the occasion of his visits to Manfredi's home. We treated LaCosa's statements as circumstantial evidence because they represented the declarant's *personal knowledge.* When added to the other corroboratory circumstances we concluded that they had a "ring of reliability." Compare *Manfredi* with United States v. D'Amato, 493 F.2d 359, 365 (2d Cir. 1974). No such "ring of reliability" exists here. In the first place the state-

ments relied upon by the government are not those of Venetucci with respect to his personal dealings with Gutierrez, which might conceivably fit within *Manfredi,* but statements of Sorrentino, who had no personal relationship at all with Gutierrez. For all we know Sorrentino may have been basing his description of Gutierrez as Venetucci's "partner" on rumors that he had heard from persons other than Venetucci. To admit such rank "double hearsay" as "circumstantial evidence" or "verbal acts" would be to make a mockery of the "non-hearsay" threshold requirement.

The danger inherent in permitting such hearsay to be used as the basis for admitting still more hearsay declarations of co-conspirators is rather obvious. Aside from the lack of opportunity to cross-examine the declarant and the obvious second-hand nature of Sorrentino's statements, out-of-court statements by Venetucci himself were introduced which suggested that Gutierrez had not agreed to participate in the narcotics scheme. Thus, in a conversation with Sorrentino on February 1, 1973, with respect to obtaining a loan to make up the $8,000 deficit in the price ultimately secured by Cirillo for the narcotics which Venetucci had agreed to buy, Venetucci expressly denied any understanding that "Frankie" was to share in payment of the deficit.

It may be that the "non-hearsay" threshold requirement for admission of hearsay declarations of co-conspirators, which had been liberalized through a series of modifications since its inception, compare United States v. Nardone, 127 F.2d 521, 523 (2d Cir.), cert. denied, 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942), and United States v. Pugliese, 153 F.2d 497, 500 (2d Cir. 1945), with United States v. Geaney, *supra,* will be relaxed even further to permit introduction of certain statements of co-conspirators regardless of their unavailability for cross-examination, subject to conditions that will be deemed sufficient to guarantee their trustworthiness. See Proposed Rules of Evidence for the

United States District Courts and Magistrates, Rules 803(1), (2). Until such a change is made, however, we must adhere to the standing rule which requires us to exclude hearsay where the threshold test has not been made.

Since the proof of Sorrentino's statements as to the reasons for Venetucci's visit to Gutierrez was inadmissible as evidence of Gutierrez's participation, the trial court could not properly consider it in applying the "fair preponderance" test with respect to Gutierrez. Cf. Dutton v. Evans, 400 U.S. 74, 88, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); General Tire of Miami Beach, Inc. v. NLRB, 332 F.2d 58, 61 (5th Cir. 1964). In light of the government's failure to adduce any non-hearsay evidence that Gutierrez was aware of the narcotics transaction, we are constrained to hold that it proved no more than mere association between Gutierrez and Venetucci, which cannot be the basis for an inference of guilt. See United States v. Fantuzzi, 463 F.2d 683, 689–690 (2d Cir. 1972); United States v. Cimino, 321 F.2d 509–510 (2d Cir. 1963), cert. denied, 375 U.S. 974, 84 S.Ct. 491, 11 L.Ed.2d 418 (1964); United States v. Bentvena, 319 F.2d 916, 949 (2d Cir.), cert. denied, [Ormento v. United States, Di Pietro v. United States, Fernandez v. United States, Panico v. United States, Galante v. United States, Loicano v. United States, Mancino v. United States, Sciremammano v. United States, Mirra v. United States], 375 U.S. 940, 84 S.Ct. 345, 346, 353, 354, 355, 360, 11 L.Ed.2d 271, 272 (1963); United States v. Stromberg, 268 F.2d 256, 267 (2d Cir.), cert. denied sub nom. Lassa v. United States, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). See also Glover v. United States, 306 F.2d 594 (10th Cir. 1962).

### (c) Gaber

■ The non-hearsay evidence of Gaber's participation in the March transaction was even less persuasive than that with respect to Gutierrez. It consisted only of (1) Gaber's presence with Cesare in the White Castle parking lot on the evening of March 14, (2) his presence there again on the evening of March 15 when Cesare met with Sorrentino, and (3) Gaber's statement later that evening when he and Cesare were stopped by police that he was in the neighborhood to see "Brother" Sorrentino. There was no showing that narcotics were ever discussed in Gaber's presence, Gaber did not act furtively or lie to the police when questioned. Nor did he commit any act suggesting that his association with Cesare was illicit in nature. Mere presence at a site where a narcotics sale has been planned, without some showing that the defendant knew of it, is not enough to satisfy the "fair preponderance" test.[11] See United States v. Fantuzzi, supra; United States v. Cimino, supra, and other decisions cited on page 883.

The decisions relied upon by the government do not support its argument that there was sufficient non-hearsay evidence of Gaber's membership in the conspiracy to admit the hearsay declarations of alleged co-conspirators. In United States v. Calabro, 449 F.2d 885 (2d Cir.), cert. denied, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1971), in affirming a narcotics conviction, we regarded "of critical importance" the fact that the defendant, who had been present at several meetings between the seller and the intended customer, an undercover agent, carefully scrutinized the agent and at one point actually frisked him.[12] And in United States v. Rag-

---

11. Cesare's statement in one of his March 14 telephone conversations with Sorrentino to the effect that he (Cesare) had "Gabe" (Gaber) with him added nothing to the government's proof of guilty knowledge on the part of Gaber.

12. It was not actually clear from the evidence that the defendant himself frisked the undercover agent. The frisking occurred when the agent was standing at the urinal in a restaurant's men's room as the defendant and his colleague passed behind him.

land, 375 F.2d 471, 473 (2d Cir. 1967), we upheld the admission of hearsay evidence against a defendant only after noting that a co-defendant had not only used the "Slanguage" of narcotics dealings in the defendant's presence but had also explicitly referred to "narcotics." Compare *Calabro* and *Ragland* with Ong Way Jong v. United States, 245 F.2d 392 (9th Cir. 1957) (conviction reversed although defendant was constantly with co-defendant who sold narcotics); Glover v. United States, 306 F.2d 594 (10th Cir. 1962) (conviction reversed although defendant seen in vicinity of narcotics transaction between co-defendant and undercover agent) and People v. Garcia, 201 Cal.App.2d 589, 20 Cal.Rptr. 242 (1962) (conviction reversed although defendant present at time of narcotics sale).

Since the government failed to adduce sufficient non-hearsay evidence of Gaber's participation in the conspiracy, his conviction must be reversed.

## Variance Between Proof and Indictment

■ Venetucci, Lilienthal and Cesare [13] advance the argument, frequently asserted in conspiracy cases, see United States v. Borelli, 336 F.2d 376, 380 (2d Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), that even assuming the involvement of each in one of the two transactions, the evidence showed two independent conspiracies, óne in January and the other in March, 1973, rather than the single on-going conspiracy alleged. The issue turns on whether the proof warranted an inference that each of the three, in dealing with a member of the core group (Cirillo, Murphy and Sorrentino), was aware of, and thus knowingly furthered, the core group's overall ongoing venture or partnership. See *Borelli, supra* at 385. Although a single trans-

action with, or function performed for, a representative of the core group may under some circumstances be insufficient to warrant an inference of knowledge of the extensive nature of the core group's activities, see United States v. DeNoia, 451 F.2d 979 (2d Cir. 1971); United States v. Aviles, 274 F.2d 179, 189–190 (2d Cir.), cert. denied, [Evola v. United States, Lessa v. United States, Capece v. United States, Di Palermo v. United States, Genovese v. United States], 362 U.S. 974, 80 S.Ct. 1057, 1058, 1059, 4 L.Ed.2d 1009, 1010 (1960); United States v. Stromberg, 268 F.2d 256, 267 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959), we have recognized that it is "not an arbitrary rule which is to be applied rigidly and without reason." See United States v. Agueci, 310 F.2d 817 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S. Ct. 1016, 10 L.Ed.2d 12 (1963). Indeed, just recently we said that "it would be unrealistic to assume that major producers, importers, wholesalers or retailers do not know that their actions are inextricably linked to a large on-going plan or conspiracy." United States v. Arroyo, 494 F.2d 1316, 1319 (2d Cir. 1974).

■ We are not here confronted, however, with merely a single delivery or purchase on the part of each of these three appellants (Venetucci, Lilienthal and Cesare) which, without more, might not support knowledge of a broader conspiracy, see e. g., United States v. DeNoia, *supra,* but with deeper involvement on the part of each of these participants. Venetucci met on at least two occasions with all three members of the core group, took delivery of one kilogram of heroin and, when he and his partner were unable to make payment, redelivered the kilo and was informed that the core group had resold it elsewhere at an $8,000 loss, following which negotiations were conducted regarding

---

13. Gutierrez and Gaber also complain of a variance as to them but we need not consider these claims since we have already concluded that the evidence was insufficient to connect them with either the January or March transaction.

payment of the deficit. From all of these circumstances—the large quantity, the number of meetings and his knowledge of the resale—the jury was entitled to infer that as a major retailer Venetucci knew that he was participating in a larger on-going venture. See United States v. Arroyo, 494 F.2d 1316, 1319 (2d Cir. 1974).

■ In the cases of Lilienthal and Cesare the evidence shows, in addition to their participation in a transaction involving a large quantity, that they used narcotics code language in their dealings, Lilienthal making a delivery of a half kilo in response to Cirillo's request for "half-filled out" income tax papers and Cesare negotiating for the "sample of the dress." From these circumstances, including their use of prearranged code language, the jury could infer knowledge that they were participating in a continuing major business which extended in scope beyond the particular transaction and depended for its success upon a chain of distribution in which each principal played an essential part. United States v. Bynum, 485 F.2d 490, 495–496 (2d Cir. 1973); United States v. Miller, 381 F.2d 529, 533 (2d Cir. 1967).

■ Even assuming there was a variance between the government's proof and the indictment, we are directed to no specific prejudice resulting from the variance and we are convinced that there could have been none. Unlike Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1945), which involved 36 alleged co-conspirators and some 8 separate conspiracies to defraud the government in relation to FHA loans, here there were only 8 alleged co-conspirators and at most two separate conspiracies each of which was proved beyond a reasonable doubt by evidence relating only to it. Moreover, the trial court cautioned the jury that "[w]hether or not a defendant was a member of a conspiracy must be determined on the evidence . . . as to his own actions, his own conduct, his own statements and declarations, his own connection with the acts, and conduct of the other alleged co-conspirators." In Blumenthal v. United States, 332 U.S. 539, 560, 68 S.Ct. 248, 92 L.Ed. 154 (1947), which, like this case, involved a relatively small number of alleged co-conspirators and conspiracies, the Court found that a similar instruction had reduced the risk of an impermissible transfer of guilt to a minimum.

### Miscellaneous Other Points

#### (a) The Contents of the Paper Bag

■ Sorrentino argues that his conviction on Count 2 (distribution of one kilogram of heroin on January 18, 1973) must be reversed since the government offered no direct proof that the paper bag carried by Cirillo to the meeting with Murphy, Sorrentino and Venetucci at Sorrentino's mother's apartment on the evening of January 18 contained heroin. We disagree. There was ample circumstantial evidence that the bag contained heroin. The delivery of the bag was the result of Sorrentino-Cirillo telephone negotiations in narcotics jargon and was followed by angry discussions regarding Venetucci's failure to deliver the "thirty," (e. g., $30,000), the approximate going price for a 50% pure kilogram of heroin. Later Cirillo and Sorrentino agreed to get the "dress" (i. e., narcotics) off Venetucci.

#### (b) The Introduction of the Cocaine Found on Murphy and Cirillo

■ Appellants Murphy and Cirillo argue that the trial court should not have permitted the government to introduce the small quantities of cocaine found on them at the time of their arrest (in addition to the half kilogram of heroin found on Cirillo) since it was evidence of crimes other than those charged in the indictment. But here the cocaine was relevant to refute the posi-

tion which the government could anticipate and which counsel for Cirillo actually tried to establish during cross-examination of government witnesses, i. e., that the heroin was planted on Cirillo as a frame-up by the arresting officers. See United States v. Purin, 486 F.2d 1363, 1367 (2d Cir. 1973); United States v. Wright, 466 F.2d 1256, 1258–1259 (2d Cir. 1972), cert. denied, 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973). In any event admission of the cocaine as evidence of guilty knowledge on the part of Cirillo and Murphy was well within the trial court's wide discretion. See United States v. Deaton, 381 F.2d 114, 117–119 (2d Cir. 1967).

### (c) *The Jury Charge*

During his charge to the jury the trial judge instructed that they should consider the wiretap evidence since he had determined that the wiretap orders were properly issued. "If I am wrong," he continued, "somebody else can reverse me, but you are bound to take my view of the law." Appellants Murphy and Cirillo argue that this statement, to which they excepted, impermissibly tended to establish a similar train of thought in the minds of the jurors—i. e., if they should render an erroneous verdict, someone else would reverse them. The unnecessary remark is confusing and conceivably could be interpreted several ways. However, even accepting the interpretation given to it by appellants, we are satisfied that under the circumstances of this case it was clearly harmless, in view of the overwhelming evidence against Murphy and Cirillo, including the tapes, visual surveillance and arrest with a large quantity of narcotics in their possession.

### Conclusion

The convictions of appellants Gutierrez and Gaber are reversed. All other convictions are affirmed.